Rebecca L. CAUDLE and Michael Caudle, Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA, et al., Defendants.

Civ. A. No. 79–C–1418–S.

United States District Court, N. D. Alabama, S. D.

July 27, 1981.

Robert B. Huie, Birmingham, Ala., for plaintiffs.

William E. Mitch, Birmingham, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLEMON, District Judge.

1. Plaintiff Michael Caudle, a member of defendant United Mine Workers, ("UMW") is a participant in the 1974 Benefit Plan and Trust ("Trust"), which was created under the provisions of the National Bituminous Coal Wage Agreement of 1974 ("Agreement").

2. Plaintiff Rebecca Caudle, wife of Michael Caudle, is a beneficiary of the Trust.

3. The Trust is administered by a Board of Trustees selected by the parties to the collective bargaining agreement which established it and provided for contributions to it.

4. The Trustees of the Trust are three in number—one representing the union, one representing the signatory operators, and the other representing the public.

5. UMW does not control the decisions of the Trustees and does not have the authority to determine benefits and disburse the funds of the Trust.

6. Section (c) of Article XX of the 1974 Agreement contains the following language:

\* \* \* \* \* \*

(2) Effective December 6, 1974, there is established a benefit plan and trust, which trust shall be known as the United Mine Workers of America 1974 Benefit Plan and Trust ("1974 Benefit Trust"). \* \* \* \* The 1974 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1974 Benefit Trust.

7. Section (d) of Article XX of the 1974 Agreement provides as follows:

(1) During the life of this Agreement, for the periods of time specified below, each signatory Employer engaged in the production of coal shall contribute to the Trusts established in this Article the amounts specified below based on cents per ton on each ton of two thousand (2000) pounds of bituminous coal produced by such Employer for use or for sale . . . .

\* \* \* \* \* \*

(iv) into the 1974 Benefit Trust: for the period beginning December 6, 1974 and ending December 6, 1975, 70.8 cents per hour on each such hour worked; for the period beginning December 6, 1975, and ending December 6, 1976, 77.0 cents per hour on each such hour worked; and for the period beginning December 6, 1976, and ending when this Agreement is terminated, 88.0 cents per hour on each such hour worked . . . for use or for sale on which contributions to the Trusts as provided for in this Article have not been made

\* \* \* \* \* \*

(iv) Into the 1974 Benefit Trust: for the period beginning December 6, 1974 and ending December 6, 1975, 34.8 cents per ton for each such ton; for the period beginning December 6, 1975 and ending December 6, 1976, 37.2 cents per ton for each such ton, and for the period beginning December 6, 1976, and ending when this Agreement is terminated, 41.7 cents per ton on each such ton.

8. Section (h)5 of the 1974 Agreement authorizes the Trustees of the Trusts created under Article XX "upon approval by the Employers and the Union, to make such changes in the Plans and Trusts hereunder as they may deem to be necessary or appropriate."

9. Pursuant to the 1974 Agreement, the 1974 Benefit Plan and Trust was established. Relevant provisions of the Trust are as follows:

Article III

\* \* \* \* \* \*

C. In the event the assets of the 1974 Benefit Trust become insufficient to pay the benefits provided hereunder, the benefits may be suspended or reduced to amounts which, in the judgment of the Trustees, can be paid from the assets of the 1974 Benefit Trust.

"D. The monies to be paid into said 1974 Benefit Trust shall not constitute or be deemed wages due to the individual employee, nor shall said monies in any manner be liable for or subject to the debts, contracts, liabilities or torts of the parties entitled to such money."

Article V

"The 1974 Benefit Trust established with the Trustees hereunder consists of such sums of money and other property, acceptable to the Trustees as from time to time shall be held by or delivered to the Trustees and such earnings, profits, and increments thereon as may occur from time to time. All such money and other property delivered to the Trustees and all investments and reinvestments made therewith or proceeds thereof and all earnings and profits hereon . . . are referred to herein as the 'assets of the 1974 Benefit Trust'."

Article XIII

The Employers and the Union reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that such modification or amendment does not permit any part of the corpus or income of the Trust to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and beneficiaries, and provided further, that the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(h)(5) of the Wage Agreement.

10. The settlors of the 1974 Benefits Trust were the signatory coal companies and UMW. The trustees consisted of defendants Harry Huge, representing the Union; C. W. Davis, representing the employer companies; and Paul R. Dean, the neutral trustee designated jointly by the coal companies and the union. These same persons also served as trustees for the 1974 Pension Trust, the 1950 Benefit Trust, and the 1950 Pension Trust.

11. Unauthorized work stoppages, or "wildcat strikes" by UMW miners occurred with sufficient frequency to seriously jeopardize stability of the trusts created under the 1974 Agreement. As of October 1, 1976 the 1950 Benefit Trust, which provided benefits for pensioners who retired before 1976, was indebted in the amount of $1.8 million to a single bank and in an untold amount representing unpaid bills from various providers of health services. Likewise, the 1950 Pension Trust was in serious financial difficulty.

12. As of October, 1976 the 1974 Benefit Trust had substantial reserves of approximately $66 million. This amount considerably exceeded the amount then required to meet the obligations of this Trust.

13. Because of the dire financial straits of the 1950 Benefit Trust and the 1950 Pension Trust, on October 5, 1976 the settlors of the 1974 Benefit Trust agreed to modify the 1974 Agreement provisions regarding contributions to the 1974 Benefit Trust. Actually, contributions to the Trust Funds were reallocated twice in 1976. In May, 1976, at the request of the defendant

trustees, the settlors authorized a reallocation of ten cents of the royalty paid for coal produced during the months of May and June from the 1950 Pension Trust to the 1950 Benefit Trust.

14. The temporary relief afforded by this stop-gap measure was short-lived, as a series of wildcat strikes erupted and exacerbated the already precarious position of both of the 1950 Trusts.

15. For the period October 6, 1976—December 5, 1976, the 77.0 cents contribution to the 1974 Benefit Trust was transferred in its entirety to the 1950 and 1974 Pension Trusts and the 1950 Benefit Trust; for the next yearly period, the 88.0 cents contribution to the 1974 Benefit Trust was similarly diverted in its entirety to the other three trusts. For the period beginning January 6, 1977 and ending upon termination of the 1974 Agreement, 10.0 cents of the 88.0 cents payable to the 1974 Benefit Trust was diverted to the 1950 Benefit and the 1950 Pension Trusts.

16. All participants in and beneficiaries of the 1974 Benefit Trust were promptly notified of the Trustee's decision to reallocate the previously-agreed to contributions to the said trust.

17. As part of the 1976 Memorandum of Agreement reallocating the contributions between the trusts, the unions undertook to advise all primary beneficiaries of the trusts of the adverse impact of the wildcat strikes on contributions to the trust funds. In the October, 1976 edition of the *United Mine Workers Journal*, it was pointed out by the defendant that

"... the serious financial difficulty facing the Funds was the loss of income resulting from recent work stoppages. The Funds' income, except for some investment income, is *entirely* from contributions made by employers signatory to UMWA wage agreements...

.　　*　　*　　*　　*　　*　　*

Your Trustees have worked long and hard to resolve the financial problems facing the Funds. We sincerely hope that we will not be put in the position of having to either cut or eliminate any of the benefits provided for in the Trusts and Plans. However, it is a simple fact that benefits cannot be provided unless revenues to the Funds are sufficient to pay for them."

18. Notwithstanding these warnings, unauthorized work stoppages continued in the fall and winter of 1976–77. During the first two months of 1977 alone, wildcat strikes deprived the Funds of approximately $5 million in contributions.

19. In the 3¼ years since the 1974 Agreement was signed, wildcat strikes alone resulted in a $64.9 million loss in income to the four Trusts.

20. In addition to the major problem of wildcat strikes, declining production levels (due to unusually harsh weather conditions) and skyrocketing hospital, doctors and medical costs rendered useless the Trustees' projections of income to and expenses of the Trusts.

21. The termination date of the 1974 Agreement was December 6, 1977. One week prior to that date, the defendant Trustees wrote to the beneficiaries of the 1950 and 1974 Benefit Trusts and advised that the trusts would be able to pay medical benefits through December 6, 1977. They further advised that in the event of a strike, i. e.,

"... if coal production—and hence, the Fund's future income—ceases on December 6, 1977, the benefit trusts will not be able to pay death benefits or medical bills for services rendered on or after that date."

22. Upon termination of the 1974 Agreement, the miners struck the signatory employers. Payments were immediately suspended under the 1974 Benefit Trust.

23. A new agreement between the signatory employers and the UMW was not reached until March 27, 1978.

24. Between December 6, 1977 and March 28, 1978 no contributions to the 1974 Benefit Fund were made by the signatory employers.

25. Between December 6, 1977 and March 28, 1978 there was insufficient income in the 1974 Benefit Trust with which to pay the medical bills of the beneficiaries of the Trust. As of November 30, 1977, the 1974 Benefit Trust had net assets of approximately $2 million; for the preceding four months, the Trust had paid out an average of $3.2 million per week in benefits.

26. Between December 8, 1977 and March 1978, Rebecca Caudle incurred $17,-933.60 in medical expenses.

27. A timely claim in the amount of $17,133.60 was filed with the 1974 Benefit Trust; and the Trustees have neither paid anything on the claim; nor do they intend to do so, for the reasons heretofore outlined.

28. The Health Services Card issued to Michael Caudle indicated on its face that it was "not valid after 05/31/78."

29. During the nationwide coal strike, lasting from December 7, 1978 until March 26, 1979, various unions and individuals donated monies for the purpose of sustaining the miners and their families during the strike. The UMW segregated these funds, and placed them into a special account, the "International Miners' Relief Fund" ("IMRF"). Miners experiencing a hardship because of medical and hospital expenses incurred during the strike period could file a claim covering these expenses with IMRF, together with a bill or statement verifying the amounts claimed.

30. The IMRF was completely independent from the 1974 Benefit Trust and, for that matter, the other three trusts referred to in the 1974 Agreement.

31. Michael Caudle filed a claim of $17,-133.00 in medical and hospital expenses with the IMRF through his local union in District 20, UMW.[1]

32. After all of the claims against the donated funds in IMRF were collected, it was determined that sufficient funds existed to pay a pro rata share—31%—of each claim. Michael Caudle was accordingly paid $5,311.42 from IMRF.

33. After the distribution of the donated funds, the IMRF was depleted and it no longer exists.

34. In the 1978 Agreement, provision is made for payments, by signatory employers of death benefits for those participating miners who died between December 6, 1977 and March 26, 1978.

35. Further, under the 1978 Agreement, up to $3 million of future contributions to the 1974 Benefit Trust may be used by the Trustees for the sole purpose of reimbursing participants and beneficiaries of the Trust for claims incurred between July 1, 1977 and December 5, 1977. Roughly $2.8 million has been determined by the Trustees as being owed to these specified participants and beneficiaries.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 29 U.S.C. § 1132.

2. Defendant United Mine Workers had no legal obligation, contractual or otherwise, to pay the medical expenses incurred by the plaintiffs, under the terms of the 1976 Agreement.

3. At the time plaintiffs incurred their medical expenses, there was no collective bargaining agreement between the signatory employers and the United Mine Workers.

4. The assets of the 1974 Benefit Trust are limited to contributions actually held by or delivered to the Trustees, and "such earnings, profits, and increments thereon as may occur from time to time." Future anticipated contributions to the Trust by signatory employers do not constitute trust assets until such time as they are made.

5. The instrument creating the 1974 Benefit Trust does not preclude a reallocation of contributions to the Trust by the settlors.

6. Since the assets of the 1974 Benefit Trust were insufficient, as of December

---

1. A district of the United Mine Workers is usually a geographical area. District 20 covers all covered mine workers employed in the State of Alabama.

6, 1977, to pay the benefits provided under the instrument creating the trust, the Trustees acted properly and within their express authority when they suspended payments under the 1974 Benefit Trust.

7. The United Mine Workers, as a party to the collective bargaining agreement, had the right to propose and/or agree to changes in the 1976 Agreement which modified the employer contributions to the trusts created thereunder.

8. The phrase "income of the Trust", as it appears in Article XIII of the 1974 Benefit Plan and Trust, refers to the earnings (through investments, interest) derived from the corpus of the trust, rather than anticipated employer contributions into the Trust.

9. For the reasons herein indicated, judgment shall be entered, by separate order, in favor of defendants and against the plaintiffs.