**AMERICAN FEDERATION OF UNIONS, LOCAL 102 HEALTH & WELFARE FUND and American Federation of Unions, Local 102**

v.

**EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Glenn D. Holden, Maury Drummond, Taylor Bernard, Jr.**

Civ. A. No. 80–444–A.

United States District Court, M.D. Louisiana.

Oct. 25, 1985.

Emile C. Rolfs, III, Broadhurst, Brook, Mangham & Hardy, Baton Rouge, La., for plaintiffs.

John S. Thibaut, Jr., Thibaut & Thibaut, Baton Rouge, La., Weimer Weinstock, Michael W. Brody, New York City, John D. Carpenter, Baton Rouge, La., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

Plaintiffs in this civil action are the American Federation of Unions, Local 102 and the American Federation of Unions, Local 102, Health & Welfare Fund. The Fund is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1) and the Union is an employee organization within the meaning of § 1002. This action was brought by the Fund and the Union against the Equitable Life Assurance Society of the United States and Glenn Holden to recover damages allegedly sustained by the Fund because of alleged violations by both defendants of fiduciary duties imposed upon them by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.

Equitable has challenged the standing of the Union and of the Fund to assert this action under E.R.I.S.A. Post-trial plaintiffs move to add Harry D. Breeden, Jr. and Lloyd J. Leger as parties-plaintiff because of this challenge. Plaintiffs relied upon Rules 15 and 21, F.R.C.P., asserting that the motion should be considered as an amendment to the complaint which would relate back to the date of the original complaint under Rule 15(c). On November 23, 1984, the court rejected that argument and denied the motion. The court also held that the Union has no standing to assert this action because, under 29 U.S.C. § 1132, such an action may be asserted only by the secretary, by a participant, by a beneficiary, or by a fiduciary.

■ The court has sua sponte reconsidered the motion to join additional parties-plaintiff. While the ruling of November 23, 1984 is technically correct, in that neither Rule 15 nor Rule 21 authorizes adding additional parties-plaintiff in the manner requested, the court notes that Rule 8(f) requires that we construe all pleadings so as to do substantial justice. Considering the motion to amend the complaint as a motion by Breeden and Leger to intervene, the motion becomes proper. Both movers are members of the Union and beneficiaries of and participants in the Fund and under Rule 24 they qualify at least for permissive intervention. Although the timeliness of the request for intervention is subject to question, both movers are willing to take the record as it is and under the circumstances, that motion, considered as a motion to intervene, is hereby GRANTED and Breeden and Leger are added as intervenors.

■ The court also considers that the Fund has standing under 29 U.S.C. § 1132(a)(3) to bring this action since the Fund is "a fiduciary" within the definitions contained in § 1002(21)(A), a point not specifically considered by the court in *Pressroom Unions, Etc., Fund v. Continental Assur. Co.*, 700 F.2d 889 (2d Cir.1983) cert. den. 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983), which holds that a pension fund cannot assert a federal cause of action

under E.R.I.S.A. In this court's view, the Congress, which clearly authorized individual trustees to file such actions, certainly intended that the Fund itself be authorized to assert such actions, particularly since the statute specifically provides that such plans may, whatever their legal entity status, sue and be sued. 29 U.S.C. § 1132(d)(1). See also, *Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300 (9th Cir.1982), holding that the list of entities having standing which is enumerated in § 1132 is not exclusive and that an employer may bring such an action. The defendants' motion to dismiss the Union as a party-plaintiff is hereby GRANTED and the motion to dismiss the Fund is DENIED.

On April 1, 1976, Holden entered a written contract with Equitable providing for the training of Holden "to solicit applications for life and health insurance policies and annuity contracts" for Equitable on a salary plus commission basis. On July 12, 1979, Holden and Equitable entered a superceding contract which simply provided for Holden to solicit applications for insurance policies as an agent for Equitable on a strictly commission basis.

Effective August 1, 1977, Equitable issued a group insurance policy (No. 55384W) to the Fund which provided life insurance, dependent life insurance and weekly indemnity benefits insurance to the participants of the Fund. At some time, at least by February 1, 1978, Equitable issued group policy No. 555384WDE to the Fund which provided life insurance, dependent life insurance, weekly indemnity insurance, major medical expense insurance and dental insurance. The "booklet" describing the Fund health insurance program contains the following provision:

 d. Review procedures:

 (1) Where a claim has been denied or partly denied, you may appeal the denial and have a review.

 (2) Within 90 days after you receive written notice your claim has been denied, you or your representative may make a written request for review to the Board of Trustees, American Federal of Unions Local 102, Drawer A. Prairieville, Louisiana 70769, who in turn will place the request on agenda for the next Board of Trustees meeting, if possible. You will be notified. (3) You may review pertinent documents relating to the denial and you may submit issues and comments in writing.

 e. Decision on review: A decision by the Board of Trustees of American Federation of Unions Local 102 Health and Welfare Fund will be made promptly and not later than 60 days after receipt of your request for review. The decision on review will be in writing and will include specific reasons for the decision. *A decision by the Board of Trustees is final and binding.* (Emphasis supplied)

In late 1978 or early 1979, the Fund was advised by Equitable that premiums for the health insurance would increase substantially. The trustees of the Fund, after consultation with Holden and some other Equitable employees, decided to undertake a self insurance health program. That program became effective in March, 1979. At that time, group health insurance with Equitable was cancelled and Equitable issued a "stop-loss" major medical policy providing for payment of claims in excess of $25,000 (policy No. 58129M).

Equitable presented a proposal to the Fund for processing and paying health claims under the self insurance program which the Fund rejected.

At that time, Holden expressed an interest in handling claims for the Fund to Maury Drummond, an Equitable district manager, and to Drummond's superior, Taylor S. Bernard, Jr., the local Equitable agency manager.

Holden entered an arrangement with the Fund which ultimately resulted in his becoming administrator of at least the health insurance benefits program. Drummond and Bernard were both aware that Holden was receiving compensation from the Fund and other Equitable employees became

aware that Holden was performing services of some sort for the Fund and was receiving compensation but none of them became aware of the extent of his activities or that he was the plan administrator. Holden remained as an Equitable agent until his termination in March, 1980, and he apparently concealed this information from the trustees of the Fund. On more than one occasion, he indicated that he had severed his connection with Equitable.

As administrator, Holden reported to James Boyette, president of the Local and a member of the Board of Trustees. Boyette authorized Holden to accept numerous late payments from members and former members and to extend coverage to members who were not qualified. Holden at times, made such decisions without consulting Boyette. During the period that Holden served as administrator of the Fund, 279 late payments were accepted from members totaling $22,238.11 and $212,534.41 was paid out as benefits to those non-covered members for a net loss to the Fund of $190,296.30.

Holden claims that he formed a corporation to contract with the Fund but no evidence of such a corporation was offered in evidence. The evidence does show that many of the Fund's checks to Holden were payable to "Glenn Holden & Associates" or to "Glenn Holden & Associates, Inc."

In May, 1979, Holden recommended to the Fund that it replace the $10,000 group life insurance policy with $5,000 whole life individual policies. The trustees approved the change and, after some initial problems, Equitable provided whole life insurance in the amount of $5,000 for approximately 1,400 members of the Fund from July, 1979 through March, 1980.

Premiums for the group term life insurance in the amount of $10,000 averaged $6,594 monthly while premiums for whole life in the amount of $5,000 was $14,352.69 per month.

The switch from group life at $10,000 to whole life at $5,000 was unsound for many reasons, not the least of which was that the Fund was already in arrears on premium payments to Equitable on other coverages at the time the change was made. Holden and his clerical employees filled out and signed virtually all 1,400 applications for whole life insurance without even consulting the individual members. Holden received at least $65,000 in commissions from Equitable on the sale of the whole life policies.

Equitable cancelled the whole life policies in March, 1980, and reversed the entire transaction, repaying the full premium to the Fund.

The Fund paid Holden some $43,000 as administrative expenses plus 12% of claims, amounting to some $83,000. This amount was higher than is usual in such cases. Holden was not an actuary and had had no experience in processing claims.

At the time the Fund began its self insurance health program in early 1979, Equitable representatives indicated that Equitable would turn over some $280,000 which it had been holding as a reserve for claims under its cancelled health insurance policy and that this transfer would occur in about ninety days. Equitable did not make the transfer within ninety days and on August 11, 1980, the Fund entered suit against Equitable. In February, 1981, that action was compromised and Equitable paid some unspecified sum to the Fund. No copy of any settlement agreement was offered in evidence but a copy of the judgment of dismissal with prejudice (Exhibit D–6) was received in evidence.

Not surprisingly, the Fund lost large amounts of money and eventually became insolvent through a combination of mismanagement by Holden and Boyette and the fact that the self insured plan was not actuarily sound to start with.

The Fund borrowed money from its vacation fund and the members of the Local voted to transfer 1% of pension fund contributions for a one year period which amounted to a donation of $277,143.56 to the Fund. Plaintiffs claim that this reduction in pension benefits compounded at 8% to September 1, 1984, near the date of the

trial, amounts to $377,050.74 which ought to be considered a loss to the Fund. In addition to the $190,296.30 in non-covered claims paid, plaintiffs demand $123,000 paid to Holden as administrator, and $8,746 paid as allegedly unnecessary additional insurance acquired from Equitable because of Holden's payment of non-covered claims, or a total of $976,236.30.

■ This court has jurisdiction of this action under 29 U.S.C. § 1132(e) since it is an action brought by a fiduciary and participants of an employee benefit plan against alleged fiduciaries for appropriate relief under 29 U.S.C. § 1109.

Clearly and undisputedly, Holden became a fiduciary with respect to the plan under Section 1002(21) when he became administrator, since he exercised discretionary control and authority respecting management of the Fund, as well as its assets and under 29 U.S.C. § 1109, Holden will be liable to the Fund for any losses caused by his breach of the "responsibilities, obligations, or duties imposed upon fiduciaries" by E.R.I.S.A.

■ While the evidence convinces the court that Holden's fees and commissions were excessive and unfair to the Fund, he was not the administrator at the time these fees and commissions were negotiated. Since he was not a fiduciary at the time that the trustees agreed to pay the fees and commissions, Holden is not liable to refund any portion which might be shown as excessive. See *Schulist v. Blue Cross of Iowa,* 717 F.2d 1127 (7th Cir.1983), pointing out that the Congress took a functional approach to the definition as to who is to be treated as a fiduciary under Section 1002(21) and holding that an insurance company which allegedly negotiated unreasonable rates of compensation for itself, did not become a fiduciary until it began to perform the contract containing the alleged unreasonable rates. Here the situation is similar. Prior to becoming plan administrator, Holden was simply an insurance salesman who sold some insurance policies to the Fund. He had no fiduciary status with respect to the Fund and thus his liability will be limited to breaches of fiduciary obligations occurring only during the time he served as administrator.

■ The fiduciary is charged by Section 1104 to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits and paying reasonable expenses, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct" of the enterprise, all in accordance with the plan documents. Holden, therefore, despite his own lack of skill and experience in claims administration, will be held to the standard of a skilled administrator.

■ It is quite obvious that no prudent administrator would approve claims payments for non-covered claims and between them, Holden and Boyette approved 279 such claims which caused the loss to the Fund of $190,296.30. Although there is no evidence as to which late payments were approved by Holden and which by Boyette, Holden is liable for Boyette's breaches of fiduciary obligation as his co-fiduciary under Section 1105(a)(1) and (3) because Holden knowingly participated with Boyette in such activities and he moreover made no effort to remedy the breaches of which he had knowledge. Thus, the Fund is entitled to judgment against Holden for the full amount of that loss.

■ Plaintiffs also insist that Holden be held for all losses sustained by the Fund, including delay in payment of reserves by Equitable and conversion to whole life policies. There is no evidence from which one can determine the precise impact of the delay by Equitable in payment of the reserves but, in any event, Equitable has now paid that which was due and the judgment is final and is res judicata. More to the point, there is no evidence that Holden was in any way connected to the delay in payment. On the contrary, the evidence is

that he urged his superiors at Equitable to promptly make the payment.

As to the whole life policies, that was clearly not to the benefit of the participants, but again, Equitable has reversed the transaction and has refunded the entire premium. The evidence does not establish that the Fund incurred any additional loss because of the conversion to the whole life policies. Accordingly, the Fund has been paid for that loss and Holden may not be held for it.

There is no evidence to support the claim that Equitable was paid an "unnecessary" premium of $8,746 as a consequence of Holden's activities. Such an opinion was advanced by the firm's certified public accountant but there are no facts in the record to support that opinion.

As noted earlier, the cause of the Fund's insolvency was a combination of mismanagement by Holden and Boyette and an actuarily unsound benefits program. Since Holden's advice to the trustees to establish a self insurance program was given and accepted before he acquired his fiduciary relationship, he cannot be held liable for the bad advice. Like most free advice, it was not worth what was paid for it. Accordingly, Holden's liability will be limited to making good to the Fund the loss which has actually been proved to have been caused by his breach of fiduciary obligation, $190,296.30 resulting from payment of non-covered claims.

Plaintiffs also assert that Equitable was a fiduciary under Section 1002(21) because it exercised "authority or control respecting management or disposition" of the Fund's assets. Specifically, the Fund claims that the reserves discussed earlier were managed and controlled by Equitable. The evidence indicates that Equitable demanded that unpaid premiums on other coverages be paid before it would release the reserves and plaintiffs claim that this amounted to "exercising control" over the asset. While the evidence does not disclose either the precise amount or nature of the reserves, the court assumes that they constituted monies which Equitable estimated

would be needed to pay claims under the health insurance policy which it had issued but which became surplus, to some degree, when the policy was terminated. The delay in making this payment may have contributed to a cash flow problem that damaged the financial integrity of the Fund but there is no evidence as to precisely what that result was. In any event, as noted earlier, Equitable has made a settlement with the Fund on that issue and a judgment of dismissal with prejudice has been entered in that case.

The evidence in this record establishes that Equitable issued several policies of insurance to the Fund. At no time did it have or exercise any authority over management or disposition of the Fund's assets. Equitable never possessed discretionary authority to review and determine denied claims. In fact, the evidence shows that the trustees retained that authority themselves. Equitable's status was never more than an insurer and it is plain that simply issuing insurance policies to a covered plan does not constitute the insurance company a fiduciary. *Austin v. General American Life Ins. Co.*, 498 F.Supp. 844 (N.D.Ala.1980); *Cate v. Blue Cross & Blue Shield of Ala.*, 434 F.Supp. 1187 (E.D.Tenn. 1977). See also, *Lederman v. Pacific Mutual Life Ins. Co.*, 494 F.Supp. 1020 (C.D. Cal.1980) (dicta). On the other hand, an insurance company can become a fiduciary where it makes payments of claims using the money of the Plan and it makes final dispositions of denied claims. See, *Sixty-Five Security Plan v. Blue Cross & Blue Shield*, 583 F.Supp. 380 (S.D.N.Y.1984); *Blue Cross v. Peacock's Apothecary, Inc.*, 567 F.Supp. 1258 (N.D.Ala.1983); *McLaughlin v. Connecticut General Life Ins. Co.*, 565 F.Supp. 434 (N.D.Cal.1983); *Eversole v. Metropolitan Life Ins. Co., Inc.*, 500 F.Supp. 1162 (C.D.Cal.1980) (dicta). See also, *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir.1983), where the medical carrier administered the claims procedure, determined the claims to be honored and benefits to be paid and also provided a claims review and appeal proce-

dure, making final decisions thereon. In this case, Equitable was never more than an insurance carrier, paying claims using its own funds on the policies which it issued and charging the Fund premiums for the insurance. As such, Equitable simply had a series of arms length contracts with the Fund and it never became a fiduciary in any respect.

Had the Fund accepted Equitable's proposal in February, 1979 to "handle" (process?) health claims for the self-insured program, it might have become a fiduciary, depending upon the extent of the activities undertaken, but the Fund rejected that offer and hired Holden to administer the program.

■ Plaintiffs argue at length that Equitable ought to be held liable for all of Holden's activities because he remained an Equitable agent while administering the Fund. It is true that Drummond and Bernard and some other Equitable employees were aware that Holden was being compensated by the Fund for services that he provided for the Fund but there is no evidence that they participated in Holden's mismanagement or indeed that any of them were aware of those activities, all of which were undertaken by Holden in his individual and private capacity, not as a representative of Equitable. The evidence is absolutely undisputed that the Fund contracted with Holden ("Glenn Holden & Associates"), not with Equitable to be the administrator of the Fund. The mere fact that Holden was also an employee of Equitable does not impose legal responsibility upon Equitable for Holden's activities which were undertaken outside the scope of his employment. Holden's activities as administrator are clearly outside the scope of his employment as a salesman for Equitable. Assuming that Equitable might be held liable for Holden's bad advice in converting the $10,000 group life policy to individual $5,000 Equitable whole life policies, the evidence shows that Equitable has already made that loss good.

There is no basis in this record for holding Equitable liable as a fiduciary or as a co-fiduciary. The evidence does show that some Equitable employees were more interested in selling insurance policies than they were in the welfare of the purchaser but that is not unknown for peddlers of insurance policies and, in the absence of a fiduciary relationship, creates no liability under E.R.I.S.A. (except Holden, of course).

There are some references in the briefs filed in this matter to state law claims against Equitable but neither the complaint nor the pretrial order asserts such claims. Accordingly, they are not considered.

Equitable has cross claimed against Holden for recovery of the commissions paid to him on the sale of the $5,000 whole life policies. Those parties have stipulated that Equitable is entitled to judgment against Holden in the amount of $65,000.

For the foregoing reasons, there will be judgment in favor of the Fund, Breeden and Leger against Holden in the amount of $190,26.30 together with legal interest thereon and reasonable attorney's fees and costs of this action. Plaintiffs may file supporting documentation for attorney's fees within ten days of the date of these findings and conclusions.

There will be judgment in favor of Equitable and against plaintiffs rejecting all demands and there will be judgment in favor of Equitable and against Holden in the amount of $65,000 together with legal interest.