**Arnold JACOBSON, et al.**

**v.**

**The JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY.**

**Civ. No. N–84–663 (PCD).**

United States District Court,
D. Connecticut.

March 17, 1987.

Final Judgment on Consent
June 23, 1987.

Joseph V. Meaney, Jr., Gross, Hyde & Williams, Hartford, Conn., for plaintiffs.

Philip S. Walker, Day, Berry & Howard, Hartford, Conn., for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiffs are trustees of the International Brotherhood of Electrical Workers ("IBEW") Local Union No. 90 pension fund ("plan"). In October 1962, plaintiffs and defendant entered into a contract, Group Annuity Contract No. 738 ("GAC 738"), a "Defined Benefit Plan" under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(35).[1]

GAC 738 began as a Deposit Administration Contract ("DAC"). Under DAC, payments to the insurer by the plan were held in an "unallocated fund during the active lives of the participants." Affidavit of David Sherburne at 3. The DAC account was periodically credited with interest and additional dividends could be credited depending on the fruitfulness of defendant's investment strategies. When a plan beneficiary retired, died, or became disabled, the amount of the premiums required to ensure the participant the benefits to which he was entitled under the plan was withdrawn and used to purchase an annuity. *Id. See generally* S. Goldberg and M. Altman, "The Case For the Nonapplication of ERISA to Insurers' General Account Assets," 21 Torts and Insurance L.J. 475, 479 (Spring 1986) (hereinafter "Goldberg & Altman").[2]

On January 1, 1973, GAC 738 was converted to an Immediate Participation Guarantee Contract ("IPG"). "The IPG ...

---

1. GAC 738 was amended in 1977 to allow IBEW Local Union No. 37 pension fund to merge with the plan.

2. Neither party brought this article to the court's attention. It is clear, in view of the way defendant's brief mirrors the article, that its existence was probably known.

[was] the fund in which amounts [were] accumulated by [defendant] to be used for the payment of the benefits provided under [the] contract." Contract at II–1.0. Employers of plan beneficiaries paid to plaintiffs amounts set by their respective collective bargaining agreements. Those funds were then paid by plaintiffs to defendant minus certain reasonable expenses plaintiffs incurred in administering the fund. A separate reserve was established by defendant as part of the IPG (referred to as the Liability of the Fund ("LOF")), from which annuities were purchased to meet the pension entitlement of a participant. "The [LOF] on any date [was] the sum of the amounts required ... to enable [defendant] to fulfill its guarantees with respect to: (a) the benefits established under [the contract], and (b) any due and unpaid amounts chargeable to the [IPG]." *Id.* at I–5.0. The mathematical formula designed to make the LOF calculations were fixed in the contract. *Id.* at II–5.0 to 9.0. At no time could plaintiffs' contributions fall below the minimal amount necessary to operate the fund—equal to 110% of the LOF. *Id.* at II–2.0; II–5.0.

Defendant "assume[d] no liability as to the sufficiency of [IPG] to provide for the benefits under [the] contract other than those benefits for which amounts [were] included in the LOF." *Id.* at II–3.0. Defendant was liable, however, for the contributions made to and for pension benefits once a participant's entitlement was fixed. *Id.* at II–3.0; II–5.0. A participant's entitlement was determined when he/she retired, died, or became disabled. When an entitlement was determined, defendant credited the LOF with an amount necessary to pay the benefit. Defendant then commenced periodic payments in accordance with the entitlement. Defendant guaranteed those payments. Deposition of Donald Morrison at 93. Plaintiffs were obligated to make additional contributions to cover any shortfall experienced by the LOF. In default of such contributions, defendant's obligation to pay benefits was reduced by a percentage determined by the LOF shortfall. Contract at II–5.0.

"Contributions payable [to IPG were] ... assigned to the General Investment Account [ ("GIA") ]." *Id.* at I–5.0. Plaintiffs had the option of making such contributions to IPG, investing in another insurance company, or investing in one of defendant's separate accounts. *Id.* at II–1.0. The contributions actually made were pooled by defendant with its other contractholders' funds and invested, usually in fixed income securities. Affidavit of David Sherburne at 4. The IPG differed from the DAC in that the latter established a partially fixed investment return and set the operating expenses at a fixed rate. The return on the investment in the IPG, however, depended entirely on the investment performance of defendant's GIA. Also, under the IPG, plaintiffs were charged with defendant's actual costs. Deposition of Donald Morrison at 33–34. The IPG accounts were adjusted annually to reflect the net investment experience minus expenses and taxes. Contract at II–3.0; Deposition of Klaus Shingley at 7. These adjustments were to "be determined by [defendant] in accordance with its regular procedures applicable to contracts of this class and in effect at the time such adjustments are made." Contract at II–3.0. Such determinations were conclusive.

In 1983 and through 1984, plaintiffs sought to terminate GAC 738. On April 30, 1984, defendant allegedly reported that plaintiffs had $8,105,680.36 in the GIA. After setting aside $2,814,567.00 for the LOF, and adjusting the balance to reflect a $944,463.73 negative market value adjustment, the remaining $4,346,649.63 was paid to plaintiffs. A subsequent reduction in the LOF in November 1984 necessitated an increase in the negative market value adjustment to $946,636.79. The contract was thereafter terminated.

Plaintiffs allege that under ERISA, since January 1, 1975, defendant was a fiduciary of the plan, 29 U.S.C. § 1002(21)(A), and a party-in-interest relative to that plan, 29 U.S.C. § 1002(14). Plaintiffs allege that:

(1) Defendant breached its fiduciary duty by:

(a) advising plaintiffs to invest in the DAC and IPG despite knowing that said investments were not prudent;

(b) paying less than the book value of the plan's investment returns;

(c) failing to disclose how it determined the amount of fund assets that were distributed upon cessation of the fund;

(d) failing to disclose the actual or market value losses to the plan;

(e) failing to disclose its investment fees.

Complaint at ¶ 30.

(2) Defendant violated 29 U.S.C. § 1104(a)(1) by not managing the plan:

(a) for the exclusive purpose of providing benefits to plan participants and defraying expenses to the plan;

(b) with the care, skill, prudence and diligence that a prudent company would have done under like circumstances;

(c) so as to diversify its plan investments to minimize loss;

(d) so as to eliminate loss;

(e) in accordance with the documents governing the plan.

Complaint at ¶ 31.

(3) Defendant violated 29 U.S.C. § 1106(a)(1)(D) by causing the plan to engage in transactions which constituted a direct or indirect transfer to, or use by, or for the benefit of, a party in interest of the plan and by arranging with a party in interest to provide services necessary for the operation of the plan.

Complaint at ¶ 32.

(4) Defendant violated 29 U.S.C. § 1106(b)(1) and (2) by:

(a) dealing with the plan assets in its own interest;

(b) engaging in transaction with other parties whose interests were adverse to the interests of the plan and which transactions involved the plan.

Complaint at ¶ 33.

Plaintiffs have now moved for partial summary judgment on the issue of defendant's status as a fiduciary.

*Summary Judgment:*

To grant a motion for summary judgment, there can be no "genuine issue as to any material fact" and the moving party must be "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 313 (2d Cir.1981). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American Int'l Group, Inc. v. London American Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981), quoting *Heyman v. Commerce & Indust. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). Moreover, there must be no controversy as to inferences which may be drawn from the facts of record. *Phoenix Savings & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967). In determining whether or not there is a genuine factual issue in the case, the court must "resolve all ambiguities and draw all reasonable inferences against the moving party." *Schwabenbauer,* 667 F.2d at 313. *See also United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). However, one against whom summary judgment is sought cannot rely on factually unsubstantiated conclusory allegations to sustain a claim that questions of fact exist. *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). "Plaintiff could not defeat the properly supported motion [for summary judgment] ... without offering 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

*Discussion*

Fiduciary is defined in 29 U.S.C. § 1002(21)(A) as one who

(i) ... exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting

management or disposition of its assets, (ii) ... renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) ... has any discretionary authority or discretionary responsibility in the administration of such plan.[3]

## I. *Management and Disposition of the Plan Assets*

 Whether defendant is a fiduciary first requires a determination of the plan assets involved in this contract. The term "plan assets" is not defined in ERISA and has not been construed by courts when considering other provisions of ERISA. Generally, the assets of a pension plan include all contributions received by the plan administrators, including any earnings, profits, or other increments of value which may periodically accrue to the plan of value to the plan from which benefits may be paid. *Caudle v. United Mine Workers of America*, 523 F.Supp. 91, 95 (N.D.Ala.1981); *see also* Vol. 51 Fed.Reg. 41281 (1986) (to be codified at 29 C.F.R. § 2510) ("Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, including any of the underlying assets of the entity.").

### A. *Statutory Construction*

The definition, particularly as related to the insurance industry, is complicated by 29 U.S.C. § 1101(b)(2), which provides, in relevant part:

(2) In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any

assets of such insurer. For purposes of this paragraph:

\* \* \* \* \* \*

(B) The term "guaranteed benefit policy" means an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer. Such term includes any surplus in a separate account, but excludes any other portion of a separate account.

"The language of this provision has been the source of some uncertainty regarding general account contracts because of the use of the term guaranteed benefit contract which is a term which has never been part of the insurance industry lexicon." Goldberg & Altman at 482. Defendant argues that this section creates a "safe harbor from 'plan assets' treatment for assets attributable to guaranteed benefit policies." Defendant's Memorandum at 35. The argument continues that, since GAC 738 was created to "provide for" payment of "benefits" to the plan participants, the plan must, therefore, be interpreted to be, in its entirety, a guaranteed benefit policy. Defendant implies that the "to the extent" language in subparagraph (B) must be read broadly to include the funds held in the GIA, since those funds are really nothing more than a reserve from which the LOF is funded.[4]

Defendant's interpretation ignores the language of the statute and the realities of the contract in question. Section 1101(b)(2)(B) does indeed provide a safe harbor to insurance companies that sell standard annuity contracts to cover the anticipated needs of the relevant pension plan. *Peoria Union Stock Yards Co. v. Pennsylvania Mut. Life Ins. Co.*, 698 F.2d 320, 327 (7th Cir.1983). In the case of a guaranteed account, for instance, where pension plan funds are invested in a GIA in exchange for guaranteed benefits and a

---

**3.** The term also includes those persons designated by a named fiduciary "to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105(c)(1)(B).

**4.** *See also* Goldberg & Altman, interpreting the subparagraph (B) language as a means of distinguishing an annuity contract with guaranteed fixed benefits from a variable annuity contract where the amount of benefits fluctuate depending on a number of extraneous factors.

guaranteed rate of return, a pension plan's needs are met from the outset by virtue of the guarantees. Meeting the pension plan's obligations is, therefore, not related to the insurer's investment performance. Where there is thus an exchange of funds of the plan for the insurer's guarantee that it will make the pension plan payments, the policy itself becomes the plan asset. *Chicago Board Options Exchange, Inc. v. Connecticut General Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir.1983). The funds paid to the insurer thereby lose their identification as plan assets as they are exchanged for the insurer's fixed payment obligation. Such is not the case, however, where a contract like GAC 738 is involved. Under GAC 738, the funds contributed are managed and invested by defendant. When a participant's entitlement is fixed at retirement, death or disability, the amount required to meet the entitlement is removed from such management and investment status. Prior to that time, however, the level of funds available to support benefits which may become due fluctuates with the investment return of the insurer. Thus, unlike the guaranteed annuity contract, benefits of any or all participants are not guaranteed under GAC 738 so long as the fund contributions are subject to the investment results achieved by the insurer. Poor investment results might reduce or even exhaust the funds below the level sufficient to pay benefits as they become fixed and payable. It is this contingency which § 1101(b)(2) addresses. That section must be read as written, vis, to cover only that phase of a contract in which the obligation of the insurer to guarantee the benefits payable to plan participants is fixed. To construe the language "to the extent that" to apply to all stages of GAC 738 would exonerate defendant from the fiduciary obligation while it is managing and investing the plan contributions, when it has not guaranteed participants' benefits and while the contributions are subject to the risks of its investment decisions. Performance of aspects of a plan which does not guarantee benefit payments or a fixed

rate of return, but provide for the insurer's management of the assets until they are converted to a guarantee of the payment of benefits, cannot be sheltered under this section. This reading is supported by the second sentence of subparagraph (B), which specifically excludes from exempt status funds held in separate accounts to the extent these separate accounts do not guarantee benefit payments or a fixed rate of investment return.

### B. *Legislative History*

This reading of the statute is supported by the legislative history of ERISA and § 1101(b)(2) in particular.

> An insurance company also is not considered to hold plan assets if a plan purchases an insurance policy from it, to the extent that the policy provides payments guaranteed by the company. If the policy guarantees basic payments *but other payments may vary with, e.g., investment performance, then the variable part of the policy and assets attributable thereto are not to be considered as guaranteed, and are to be considered as plan assets subject to the fiduciary rules.*

H.R.Rep. No. 93–1280, *reprinted in* Vol. 3, 1974 U.S.Code Cong. & Adm.News, 4639, 5077 (emphasis added) ("Report"). Defendant would distinguish this language by arguing that general accounts and a separate account are fundamentally different.[5] A separate account is one which is "established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 29 U.S.C. § 1002(17).[6] The principal distinction between a general account and a separate account is that in the former pension plan assets are co-mingled with other assets/funds invested in the insurance com-

---

**5.** *See* Defendant's Memorandum at 37–38, n. 9; Reply Memorandum at 5–6.

**6.** The term "general account" is not defined in the ERISA Act.

pany, while in the latter the assets/funds are segregated. This distinction, however, is irrelevant in identifying plan assets for purposes of § 1101(b)(2), since that section only distinguishes between accounts which guarantee benefits or returns and accounts which do not make such guarantees. Thus, only accounts which guarantee fixed returns and fixed benefits are sheltered. Therefore, with respect to § 1101(b)(2), a separate account and a general account may be identical to the extent both credit the plan with returns based on the success or failure of the insurer's investments.

The statutory language and the legislative history both reflect a congressional intent to cloak the managers of both these types of accounts with fiduciary status. Report at 5077. Under both situations, the insurer manages "plan assets." Further legislative support is found in Congress' discussion of the exceptions to the rule that a fiduciary may not engage in a transaction with another fiduciary or a party-in-interest to the plan. 29 U.S.C. § 1106. "The conferees understand that it is a common practice for ... insurance companies to maintain pooled investments funds for plans.... [Insurance companies] that operate such pooled investment funds are, of course, plan fiduciaries. As fiduciaries they must act, e.g., for the exclusive benefit of participants and beneficiaries. Therefore, [an insurance company] cannot use pooled funds as a place to dump unwanted investments which were initially made on its own (or another's) behalf." Report at 5096.

## C. *Administrative Interpretation*

■ Defendant also argues that the Department of Labor ("DOL")[7] has addressed the precise issue in this case and concluded that "the monies paid to an insurance company and placed in its general account in exchange for a contract issued to an employee benefit plan do not constitute plan assets." Defendant's Memorandum at 31.

DOL Interpretive Bulletin 75–2, 29 C.F.R. § 2509.75–2 (1985), states, in relevant part:

[I]f an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction.

Assistant Secretary of Labor, Paul J. Fasser, Jr., explained the rationale for the bulletin accordingly:

Let's take a large multiemployer plan, having several thousand contributing employers, the benefits of which are wholly insured but not fully guaranteed. The insurance company invests the premiums it receives from the plan along with premiums received from other policyholders, in a wide variety of ways: corporate and government bonds, real estate mortgages, other secured loans, and some equities, to mention a few. Section 401(b) could be read to mean that the insurance company could not invest its premium receipts in bonds or equity securities issued by any of the employers contributing to the policyholder plan, it could not allow any of these employers to lease space in a building on which it held a mortgage, and it could not purchase goods, services, or facilities from any one of those employers.

... We studied the law and the underlying rationale of the prohibited transactions provisions, we studied the legislative history, we conferred with our colleagues at the Internal Revenue Service, we applied our collective common sense, and we concluded that Congress did not

---

7. Under 29 U.S.C. § 1135, the DOL was authorized to promulgate regulations. The Department of Treasury was also given administrative power. 29 U.S.C. § 1136. Administrative regulations and rulings are entitled to deference and may be disregarded only if shown to be plainly inconsistent with the laws interpreted. *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1411–12 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986).

intend this result. We recognized that the prohibited transactions restrictions are designed to avoid conflicts of interest situations, but we knew that where the premiums paid by a plan are placed in an insurance company's general asset account, along with the assets of many other plans, the risk of any one plan being able to influence the investment policy of the insurance company respecting the general asset account is extremely slight.

So we exercised our authority to interpret the law and we published an interpretive bulletin ... stating that the mere investment of plan assets by a plan in a corporate entity or partnership does not convert the assets of the corporation or partnership into plan assets and does not make the managers of the corporation or partnership fiduciaries to the plan. Those managers are thus not restricted from engaging in normal business transactions, including transactions with persons who happen to be parties in interest with respect to the policyholder plans.

Oversight on ERISA: Hearings on Public Law 93–406 Before the Subcommittee on Labor Standards of the House Committee on Education and Labor, 94th Cong., 1st Sess. 390–91 (1975) (footnote omitted), reprinted in Goldberg & Altman at 485–86.

Most recently, in devising its regulation for defining the term "plan assets," DOL again reiterated its impression of Congress' intent with regard to pension plans the assets of which are invested in the general account of an insurance company. Vol. 51 Fed.Reg. 41280 (1986) (to be codified at 29 C.F.R. § 2509.75–2).

The DOL's interpretation of the statutory language and legislative intent and defendant's reliance thereon is simply unsupportable.[8] As discussed *supra,* Congress intended to reach all separate and general accounts wherein either the benefits or the returns were not guaranteed. Indeed, DOL recognized this precise point in DOL Advisory Opinion 83–51A (9/21/83),

which specifies that the characteristic which determines whether a separate account holds plan assets is whether "the amount payable (or credited to) the plan or to any participant or beneficiary of the plan (including an annuitant) is affected in any way by the investment performance of the separate account." If the payments or returns fluctuate with investment performance, then the fund constitutes plan assets. This rationale is equally persuasive as to a contract involving a general account—the fact that the account fluctuates with the investment performance dictates that the funds thus held by the insurer are plan assets. Where the company's investment decisions thus effect the account, its actions directly affect the management and administration of the plan. That capacity to effect the participant's receipt of the benefits of the plan requires that the company be held to the standard of a fiduciary.

The DOL has also recognized the applicability of "plan asset" treatment to general account funds. In its final regulation, plan assets are defined accordingly: "In the Department's view, it would be unreasonable to suppose that Congress intended that the protections of the fiduciary responsibility provisions of the Act which are applicable where a plan directly retains a manager of its investments would not be applicable where the manager is retained indirectly through investment by the plan in a collective investment fund." Vol. 51 Fed.Reg. 41263 (1986); *see also id.* at n. 10 ("Banks, [trust companies and insurance companies] that operate such pooled investment funds are, of course, plan fiduciaries."). Elsewhere, DOL has noted that, where assets are held in a general account but subject to the investment performance of the pension plan managers, for the purpose of purchasing an annuity when a participant became eligible, the plan was deemed to hold plan assets. In analyzing this variable annuity contract, the DOL sidestepped the general language of Bulletin 75–2 by determining

---

**8.** Plaintiffs argue, in part, that Bulletin 75–2 is not applicable because defendant did not issue a "contract or policy of insurance." It seems that the intent of the bulletin, especially in view of

Fasser's comments, does indeed cover contracts like GAC 738. However, this issue need not be discussed because, even assuming such to be the intent, the interpretation is erroneous.

that the so-called general account operated as a separate account and thus could not claim the exempt status of § 1101(b)(2). It was Congress' "intent that when an insurance company provides investment advice which determines the rate of return to the plan and its participants, the assets in the account shall constitute plan assets so that the insurance company is subject to the fiduciary responsibility provision of the Act." DOL Advisory Opinion 78–8 (March 17, 1978).

 Thus, whether Bulletin 75–2 should be viewed as a DOL opinion which has been misconstrued, or whether it represents an aberration in what has otherwise been a consistent DOL policy of construing contracts like GAC 738 to hold plan assets, the statute, legislative intent, and administrative interpretations yield the clear determination that GAC 738 should be treated as holding plan assets and that defendant, as the entity responsible, at least in part, for managing and investing those assets should be held to the standards of a fiduciary. *Chicago Board Options,* 713 F.2d at 260; *Peoria,* 698 F.2d at 327.[9]

 Defendant finally argues that fiduciary status should not attach to its position, as such would conflict with the nature of general accounts. General accounts are typically characterized by three factors: (1) The assumption of obligations by the insurance company which vary depending upon the particular contract and which often involve more than the mere allocation of gains and losses. For instance, some contracts may involve guaranteed minimum rates of interest, while others may guarantee principal with the rate of return subject to fluctuation; (2) By definition, the assets in the general account are co-mingled. Investment decisions are made on the basis of the pooled assets, not on an individual, segregated basis; and (3) The forms of the contracts involved in the general account vary greatly. Thus, while it is hoped that

the investment decisions yield generally favorable results, the actual effect as to any one contract may be different than the effect on another contract. *See* Goldberg & Altman at 481–82 (for a more detailed discussion) and Defendant's Memorandum at 7–8, 15, 46. "One of Congress's principal concerns in passing [ERISA] was that the nation's enormous and growing pension funds should be held and invested safely to secure retirement benefits for workers, and not be used for other purposes. Congress was only too aware how tempting it would be for persons with access to plan assets to misuse those funds." D. Myers, "Directed Brokerage and 'Soft dollar' Under ERISA: New Concerns for Plan Fiduciaries," 42 Bus.Law. 553 (Feb. 1987). Operation of a general account inherently leads to conflict with the rule that fiduciaries must discharge their duties for the exclusive benefit of each plan's participants and beneficiaries. 29 U.S.C. § 1104. Nevertheless, that rule is clear. "ERISA clearly assumes that [fiduciaries] will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries...." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport,* 472 U.S. 559, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447, *reh'g denied,* 473 U.S. 926, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985). An insurer may not use a general account to harbor a plan's assets, create a potential for conflict, and thus claim relief from a fiduciary's obligations. Rather, so long as the funds from a plan are not converted to a fixed, guaranteed obligation but remain subject to fluctuation resulting from the insurer's investment performance, the funds are plan assets for which the insurer must be held accountable as a fiduciary.

## II. *Management and Administration of the Plan*

 Plaintiffs argue that defendant should be held to be a fiduciary by virtue

---

**9.** Defendant nevertheless argues that plaintiffs should be estopped from claiming defendant is a fiduciary as it mailed a copy of Bulletin 75–2 to plaintiffs on July 25, 1976, along with notification of its contention that Bulletin 75–2 exempted it from fiduciary status. The argument

is without merit. Title 29 U.S.C. § 1110 prohibits a fiduciary, via an agreement or instrument, from attempting to relieve itself "from responsibility or liability for any responsibility, obligation or duty" imposed by ERISA.

of the significant control it exercised over the management and administration of the plan. Defendant argues that it did not exercise enough control to make it a fiduciary.

It is well settled that an insurer may be held to be a fiduciary when it exercises control over the management or administration of a pension plan. *Ed Miniat, Inc. v. Globe Life Ins. Group,* 805 F.2d 732, 737 (7th Cir.1986); *Schulist v. Blue Cross of Iowa,* 717 F.2d 1127, 1131–32, n. 4 (7th Cir.1983); *Chicago Board Options,* 713 F.2d at 260; *American Federation of Unions v. Equitable Life Assurance Soc.,* 647 F.Supp. 947, 953 (M.D.La.1985). Under GAC 738, Article III, Section 7, defendant was unilaterally authorized to change "the rates applicable to determination of the [LOF] with respect to benefits established on or after the effective date of the change." Contract at III–3.0. If the account were transferred, defendant alone determined the "Asset Liquidation Adjustment" to determine the difference between the market value and the book value of the assets. Contract at II–16.0. Under Article II, Section 7, defendant assisted in the determination of pension benefits for participants. It was defendant who determined the amount of gains and losses to be credited to the IPG. Contract II–8.0. Defendant determined the applicable annuities according to the rates set out in Article II, Section 6(a), and could change those rates as to benefits fixed thereafter. Contract at II–5.0 to 8.0. Defendant was responsible for maintaining the LOF at a level sufficient to fund benefits. *Id.* at II–4.0. In short, defendant exercised broad control over the administration of the plan.[10] The fact that plaintiffs bargained for this discretion is irrelevant. *Ed Miniat, Inc.,* 805 F.2d at 737. It is sufficient that defendant

exercised significant control over the management of the plan. Accordingly, it is held to the standards of a fiduciary.

*Conclusion*

In summary, Congress intended by ERISA to protect funds committed to paying pension benefits and imposed a fiduciary status on those managing such funds until they were transferred into a fixed obligation or guarantee which then provided sufficient protection for the benefits. The existence of such obligation or guarantee was deemed sufficient protection to release the holder of the funds from the more stringent duty of a fiduciary. To the extent defendant had not undertaken a fixed obligation or given its guarantee, it must be held to the standards of a fiduciary in the management of plan assets.

There being no other questions of fact as to the issue presented by the motion and plaintiffs' entitlement to partial summary judgment as a matter of law, the motion is granted on the issue of defendant's status as a fiduciary.

SO ORDERED.

## FINAL JUDGMENT ON CONSENT

WHEREAS, on or about December 21, 1984, plaintiffs (by their predecessors in interest) commenced this action, alleging, among other things, (a) that defendant John Hancock Mutual Life Insurance company is a fiduciary, as defined by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), with respect to the International Brotherhood of Electrical Workers Local Union No. 90 Pension Fund (the "Pension Fund") of which plaintiffs are Trustees, and (b) that defendant breached the duties imposed upon a fiduciary under ERISA by certain

---

**10.** The Second Circuit Court of Appeals held in *Blatt v. Marshall & Lassman,* 812 F.2d 810, 813 (2d Cir.1987), that defendants had exercised "actual control over the disposition of plan assets," thus making them fiduciaries under 29 U.S.C. § 1002(21)(A)(i). While the court noted that the exercise of mere "'ministerial' functions" would not designate one as a fiduciary, *id.* at 812 (citing 29 C.F.R. § 2509.75–8), it recognized the "return of contributions to plan participants [as] one method of disposition of plan assets."

*Id.* at 813. In this case, plaintiffs have, in part, alleged that defendant paid "less than the disclosed value of the fund's assets upon termination" and failed to disclose all its fees, vis, failed to properly return the plan's contributions. Complaint at ¶ 30. As defendant was responsible for returning the plan contributions—exercising authority over plan assets—it must be considered a fiduciary. If plaintiffs' allegations are true, it may likewise be found to have breached its fiduciary duties.

acts and omissions relating to contributions placed in defendant's general investment account, which were made to defendant pursuant to the group annuity contract between the Pension Fund and defendant known as "GAC 738"; and

WHEREAS, defendant answered the complaint or or about March 29, 1985, denying its material averments; and

WHEREAS, Plaintiffs moved this Court, on or about July 3, 1986, for partial summary judgment determining that defendant is a fiduciary, as defined by ERISA, with respect to the Pension Fund (the "Motion"); and

WHEREAS, this Court, by order entered on March 17, 1987, granted the Motion (the "Order"); and

WHEREAS, defendant moved this Court, on or about March 26, 1987, for reconsideration of the Order; and

WHEREAS, this Court, by endorsement order entered on May 1, 1987, granted defendant's motion for reconsideration and, upon reconsideration, adhered to its previous ruling; and

WHEREAS, on May 11, 1987, defendant moved, pursuant to 28 U.S.C. § 1292(b), for certification of the Order for an interlocutory appeal; and

WHEREAS, defendant filed its brief in support of its motion for certification on May 11, 1987; and

WHEREAS, by endorsement orders entered on May 20, 1987, the Court (a) extended plaintiffs' time within which to file their brief in opposition to defendant's certification motion to May 25, 1987, and (b) extended defendant's time to appeal as of right from the Order from May 31, 1987, to and including June 30, 1987; and

WHEREAS, the Court thereafter extended plaintiffs' time within which to file their brief in opposition to June 15, 1987; and

WHEREAS, defendant has advised plaintiffs of its intention to seek appellate review of the Order to the fullest extent permitted by law; and

WHEREAS, the Court, upon consideration of matters set forth in defendant's brief submitted in support of its motion for certification pursuant to 28 U.S.C. § 1292(b), finds that there are genuine issues with respect to whether, in enacting ERISA, Congress intended that insurance companies be deemed to be fiduciaries, as defined by ERISA, with respect to assets contributed pursuant to group annuity contracts and held in their general investment accounts; and

WHEREAS, plaintiffs and defendant have entered into an agreement for the settlement of this action, a condition precedent to the effectiveness of which is the entry of a final judgment by the Court pursuant to which (a) the Order is withdrawn, set aside and vacated, and made of no further force or effect for use against defendant, its successors and assigns, by plaintiffs, by the Pension Fund or by third parties, for collateral estoppel or other preclusive purposes, and (b) all claims asserted herein are dismissed with prejudice, the parties to bear their own costs and attorneys' fees;

NOW THEREFORE, it is hereby

ORDERED, that the Order, together with the findings and conclusions embodied therein, is withdrawn, set aside and vacated, and shall be of no force or effect for use against defendant, its successors and assigns, by plaintiffs, by the Pension Fund or by third parties, for collateral estoppel or other preclusive purposes; and it is further

ORDERED, that this action and all claims asserted herein be, and the same hereby are, dismissed with prejudice, the parties to bear their own costs and attorneys' fees.