FLANAGAN LIEBERMAN HOFFMAN
& SWAIM, et al., Plaintiffs,

v.

TRANSAMERICA LIFE AND
ANNUITY COMPANY,
Defendant.

Case No. C–3–98–255.

United States District Court,
S.D. Ohio,
Western Division.

Aug. 26, 2002.

Terence Leslie Fague, Coolidge, Wall, Wonsley & Lombard, Dayton, OH, for Plaintiffs.

Thomas Andrew Young, Porter, Wright, Morris & Arthur, Columbus, OH, Reid Alan Evers, Steven D. Weinberg, Transamerica Occidental Life Ins. Co., Law Department, Los Angeles, CA, Jonathan Hollingsworth, Washington & Hollingsworth, Dayton, OH, for Defendant.

DECISION AND ENTRY SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW; OPINION; JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFFS; TERMINATION ENTRY

RICE, Chief Judge.

The Plaintiffs in this case are the law firm of Flanagan Lieberman Hoffman & Swaim ("Plaintiff") and the firm's 401(k) pension plan ("Plan").[1] The Defendant is Transamerica Life and Annuity Company ("Defendant"). The dispute stems from the faulty administration of the Plan, which was issued by the Defendant for the benefit of the Plaintiff's partners and employees. After having participated in the Plan for several years, the Plaintiff was informed by the Internal Revenue Service ("IRS") that an audit had revealed that the Plaintiff's partners' tax-deferred contributions to the Plan had exceeded the limit imposed by federal tax law. This fact gave rise to a tax liability and subjected the Plan's tax-deferred status to disqualification. To avoid disqualification, the Plaintiff negotiated a monetary settlement with the IRS.

Alleging that the Defendant had a duty to prevent this sort of occurrence, the Plaintiff brought this action against the Defendant on three grounds: 1) breach of fiduciary duty, arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1104, 1109 & 1132(a)(2) ("ERISA") (Count I); 2) breach of contract arising under the common law of Ohio (Count II); and 3) negligent misrepresentation arising under the common law of Ohio (Count III). In addition to damages, the Plaintiff seeks attorney fees and costs (Count IV).

The Defendant raises several defenses. To begin with, it contends that it was not a fiduciary to the Plaintiff insofar as the Plan is concerned. It also contends that the Plan has no standing of its own to join as a Plaintiff, as it cannot be shown that it has suffered an injury or that it is even a party authorized to bring suit under ERISA. With respect to the common law claims, it argues that they are completely preempted by ERISA. Finally, as to fees and costs, it argues that the Plaintiff is not entitled to such even if it prevails on the merits.

This action was tried before the Court on its merits on December 10 & 11, 2001. Herein, the Court shall set forth its findings of fact and conclusions of law with respect thereto. For purposes of providing some context, it will first set out a very brief outline of the underlying tax law by which the Plan is governed. The Court will then set forth its findings of fact, followed by its opinion, which in turn will be followed by its conclusions of law. For reasons which will be made clear in the Court's opinion, the Court finds that certain of the Plaintiff's claims are barred by law, and that as to those which are not, the Plaintiff failed to prove by a preponderance of the evidence that it is entitled to relief. Accordingly, on all counts, judgment shall enter for the Defendant.

1. See 26 U.S.C. § 401(k).

## I. *401(k) Pension Plans*

The Plan at issue is one organized pursuant to 26 U.S.C. § 401(k), commonly referred to as a 401(k) plan. Because the parties do not dispute how this law is relevant to the Plan, the Court will briefly summarize it herein. Section 401(k) allows an employer to establish a pension plan, into which employee participants may direct, on a tax-deferred basis, the deposit of up to a certain percentage of what would otherwise be taxable income. Participants are taxed on their contributions only when they make a withdrawal from the pension plan, which typically does not occur until later in life at or around the standard age of retirement (at which point individuals tend to be in lower tax brackets). Restrictions apply to how much an employer's highly compensated employees can contribute vis-a-vis the contributions of its non-highly compensated employees. Generally stated, whether an individual is a highly compensated employee is determined by reference to his ownership interest in the employer's business or to the amount of compensation he receives on account of his work for the employer. *See generally* 26 U.S.C. § 414(q). Several tests exist for determining whether the contributions of the highly compensated employees are within their legal limit, one of which requires a comparison of the percentage of deferred income contributed to the plan by the highly compensated employees (calculated as an average) with that contributed by the non-highly compensated employees (also calculated as an average). This is referred to as the actual deferral percentage ("ADP") test ("ADP test"). *See id.* § 401(k)(3)(A)(ii). Both parties to this litigation agree that with regard to the Plan at issue, the ADP of the Plaintiff's highly compensated employees was not supposed to exceed the ADP of its non-highly compensated employees by more than two (2) percentage points over any given year.

This litigation arose when it was determined by the IRS that the Plaintiff's highly compensated employees' ADP exceeded the ADP of its non-highly compensated employees by more than two (2) percentage points. This, the Plaintiff alleges, was something that the Defendant should have prevented.

## II. *Findings of Fact*[2]

1. The Plaintiff is a law firm organized as a general partnership. None of its attorneys practice ERISA law. (Doc. # 43 at 43.)

2. The Defendant is a life insurance company authorized to do business in the State of Ohio. (Compl.(Doc.# 1) ¶ 3; Answer (Doc. # 4) ¶ 3.)

3. The Plaintiff approved the purchase of, and did purchase, a group pension benefits plan (i.e., the Plan) from the Defendant on February 24, 1992, which had an effective date of January 1, 1992. Under the Plan, the Plaintiff established four annuity investment accounts to fund its pension benefits. (PX38; PX39; PX40; PX97.)

4. There are four documents relevant to the relationship between the Plaintiff and the Defendant:

 a) *Prototype Agreement.* The Prototype Agreement is a standardized docu-

---

**2.** References to Document No. 43 are to the first volume of the transcript of the bench trial (proceedings of the morning of December 10, 2001). References to Document No. 45 are to the second volume of the transcript (proceedings of the afternoon of December 10, 2001). Plaintiff's exhibits admitted at the trial and referenced herein are designated by the prefix "PX" and Defendant's exhibits by the prefix "DX". Citations to specific pages of documents produced by the Defendant in discovery may also include references to the Bates number assigned by the Defendant, designated with the prefix "TA".

ment containing boilerplate language related to the Plan structure, its administration and management, limitations on eligibility and contributions, the legal rights of concerned parties, and so forth. It also sets forth the terms governing the establishment and maintenance of the Plan trust, i.e., the corpus of the tax-deferred contributions and the interest earned thereon, as invested pursuant to the Contract, from which pension annuities would be paid. The terms of the Prototype Agreement could only be executed by the independent execution of the Adoption Agreement. (Doc. # 45 at 16; PX3.)[3]

b) *Adoption Agreement.* The Adoption Agreement is the document through which the Plaintiff executed the terms of the Prototype Agreement. In addition, it sets forth for execution the particular details of the Plan as it relates to the Plaintiff and the Plan participants, including their respective rights and obligations. The execution of the Adoption Agreement was the act by which the Plan and the Plan trust were created. This document was signed by several partners on behalf of the Plaintiff, three of whom—Charles Slicer, Jr., Bradley Smith, and Don Kovich—were designated as the Plan trustees. The trustees were responsible for directing the investment of all Plan contributions. (Doc. # 43 at 66–67; Doc. # 45 at 16; PX39.)

c) *Contract.* The Contract sets forth the duties imposed upon the Defendant as the actual investor of the Plan contri-butions, and the rights of the Plaintiff and the Plan participants with respect to said investment(s). Whereas the Adoption Agreement (along with the Prototype Agreement) defines the rights of Plan participants under the Plan, the Contract governed the relationship between the Plan itself, by and through its trustees, and the Defendant. It was signed by the Plan trustees, Charles Slicer, Jr., and Don Kovich, on behalf of the Plan. (Doc. # 43 at 68–69; PX40.)

d) *Service Agreement.* The Service Agreement is a separate agreement between the administrator of the Plan, and the Defendant, which delineates the respective rights and obligations of the parties as to the administration of the Plan. It was signed by several partners on behalf of the Plaintiff, and the Plaintiff was designated therein as the Plan administrator. (Doc. # 43 at 64–65; Doc. # 45 at 35; PX38.)

5. The Plaintiff gave only a cursory reading, if any, to the Plan documents. (Doc. # 43 at 85–86; Doc. # 45 at 68–69.)

6. The Plaintiff and Defendant agreed that the Defendant would provide, among other things, annual ADP testing. In order for the Defendant to conduct such testing, the Plaintiff was required to report to it certain Plan participant information, particularly the participant's compensation. This information was commonly referred to as "census" information. With this information, the Defendant was to verify that the ADP of the highly compensated employees did not exceed that of the

---

**3.** The Plaintiff contends by way of its Proposed Supplemental Findings of Fact and Conclusions of Law (*see* Doc. # 42) that the Prototype Agreement which it offered as its own Exhibit 3 (*see* Doc. # 43 at 53–54) should not be considered because it was produced by the Defendant during discovery, but was not in the possession of the Plaintiff prior to that time. The Court does not accept this argu-ment. The Plaintiff itself produced this document at trial. Furthermore, while several of its partners acknowledged only vague familiarity with, or recollection of, its contents (*see, e.g.,* Doc. # 43 at 54; Doc. # 45 at 68), there was no testimony at the trial that the Plaintiff never had a copy of this document in its possession.

non-highly compensated employees by more than two (2) percentage points over any given year. (PX38; Doc. # 43 at 98–107.)

7. Other "non-routine services," such as year-end coverage testing and IRS audits, were available at additional cost.[4] (PX38.)

8. For wage-earning employees, or common law employees, compensation is easily determined by reference to their W 2s. The calculus is more complex for self-employed individuals, a category which includes the general partners and associates of a law firm such as Plaintiff's. With respect to this category of participants, such factors as an individual partner's share of Plan contributions made by the partnership on behalf of its common law employees (i.e., matching contributions), the Plan contributions made by the partnership on behalf of the partner, and the partner's self-employment tax deduction, must be considered. (*Id.* at 19, 31.)

9. To initiate and facilitate the transmission of the census information, the Defendant would send the Plaintiff an information packet specifying the information which the latter was required to report. With regard to a participant's compensation, the Plaintiff was instructed to report the "total plan compensation" paid to each employee, and was informed that such was the figure used for purposes of allocating Plan contributions. (PX386 at TA02482.)

10. The Plaintiff was not aware of a more specific definition of "compensation" for its partners or other self-employed individuals. (Doc. # 43 at 103–12; Doc. # 45 at 61–63.)

11. Article 1.5 of the Prototype Agreement, as incorporated through the Adoption Agreement, provided a more specific definition of compensation for self-employed individuals:

> With respect to a Self Employed Individual, Compensation is the net earnings from self-employment, from the trade or business of the Employer in which the personal services of the Self–Employed Individual are a material income-producing factor, determined without regard to items not included in gross income and the deductions allocable to such items. Net earnings will be reduced by Employer contributions on behalf of such Self–Employed Individual under this Plan and any other qualified plan(s) of the Employer, to the extent deductible under Code section 404. Net earnings will be determined with regard to the deduction allowed to the Employer by Code section 164(f) for Taxable Years beginning after December 31, 1989.
> * * * *

This definition adequately defines the figure which needs to be reported for each self-employed individual. (Doc. # 43 at 39; PX3.)

13. The Plaintiff was confused as to the correct measure of a self-employed individual's compensation. It therefore reported what it "felt" was correct. For its part, the Defendant never asked for any figures other than those reported by the Plaintiff. (*Id.* at 83–84 & 103.)

14. At one point in 1993, the Plaintiff verbally requested assistance from the Defendant in calculating the compensation of its self-employed individuals. Polly Wong, an employee of the Defendant and one of the Plan liaisons, replied by offering an inaccurate definition which did not comport with the definition set forth in Article 1.5 of the Prototype Agreement. (*Id.* at 112.)

---

4. Expert opinion testimony as to the particulars of the "non-routine services" was not elicited from Plaintiff's witnesses, and the Defendant offered no expert testimony of its own.

15. The ADP test performed by the Defendant for the tax year 1992, conducted with respect to the contributions, which were computed on the basis of the compensation figures provided by the Plaintiff, indicated that the Plan was in compliance with the law. (*Id.* at 72; PX190 at TA02241.)

16. As it turns out, the self-employed individual compensation figures were excessive. They did not take into account all of the necessary factors, including deductions, which need to be considered in the calculus. As a result, once the compensation figures were correctly calculated, the self-employed individual's tax-deferred contributions represented a significantly higher percentage of their total compensation than what had at first been calculated by the Defendant. Given the fact that many of these self-employed individuals also qualified as highly compensated employees, what had at first appeared to be a permissible ADP of the self-employed individuals, vis-a-vis the ADP of the common law employees, was in fact excessive. (Doc. # 43 at 11-35.) [5]

17. As of March of 1995, the Plan was being audited by the IRS with respect to the contributions made for the tax year 1992. (*Id.* at 10 & 23; PX452.)

18. Ultimately, the IRS found that the ADP test failed for the tax year 1992. (Doc. # 43 at 29-30; Doc. # 45 at 8-9.)

19. In light of the IRS audit, the Plaintiff contacted the Defendant and communicated that errors had been made. The Defendant stated that it would provide additional remedial services for an additional fee. The Plaintiff did not find this acceptable, as it was of the belief that such services were a condition of the Service Agreement in the first instance. (Doc. # 45 at 62-65; PX452.)

20. The Plaintiff settled with the IRS by paying a negotiated sanction of $34,701 and making a back-contribution to the Plan of $16,309.20 on behalf of its common law employees. (Doc. # 43 at 21-24 & 74-78.)

21. Pursuant to section 5 of the Service Agreement, the Plaintiff agreed to hold the Defendant harmless for, among other things:

Any representations made by any agent or purported agent of the Company [i.e., Defendant herein] other than those expressly set forth in writing and executed by the Company at its Home Office. This includes, but is not limited to, any or all of the items within the scope of the services described in Section 1, as elected by the Administrator, and any or all charges to be made for these items; and

Reliance on any and all information submitted by the Administrator pursuant to this Agreement and on file with the Company as to accuracy and completeness. The Company will have no responsibility to verify such information and no liability for errors or omissions

---

5. By way of example, if both law partners in a two-partner law firm claim $100,000 in earnings, and then contribute $5,000 each to their 401(k) plan, then they have contributed what appears to be 5% of their otherwise taxable income. But earnings, or gross compensation, is not the correct measure of a self-employed individual's compensation for 401(k) plan purposes. Other factors must be considered. Thus, if the correct compensation figures are determined to be $75,000 each, once the pertinent adjustments have been taken into account, those $5,000 contributions come to represent 6.67% of each partner's compensation. Assuming the partners also qualify as highly compensated employees, if the ADP of their common law employees was 3%, then their contributions would fail the ADP test, as their ADP of 6.67% exceeds the ADP of the common law employees by more than two (2) percentage points.

as a result of relying on such information.

(PX38 at 5 (TA00010) § 5.3.)

22. The Defendant expressly refused to assume any fiduciary responsibility with regard to the Plan. (*Id.* at 6 (TA00011).)

23. The Plan itself did not suffer economic injury. Any losses resulting from the settlement with the IRS were ultimately borne by the Plaintiff (i.e., the partnership). (Doc. # 43 at 92–94.)

III. *Opinion*

As noted above, there is no dispute between the parties that the Plan comes within the scope of ERISA. *See* 29 U.S.C. §§ 1002(2)(A), 1002(3) & 1003(a). In dispute is whether the Plan itself has standing to sue in this instance, whether the Defendant is a fiduciary to the Plan, whether the Defendant breached its fiduciary duties, assuming it had any, and whether the Plaintiffs' common law claims are preempted or completely preempted by ERISA. The Court will consider these questions in turn.

A. *The Plan's Standing to Sue*

29 U.S.C. § 1109(a) states:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan or remedial relief as the court may deem appropriate, including removal of such fiduciary.

The Plaintiff alleges that the Defendant failed to discharge its alleged fiduciary duties prudently, as required by § 1104(a)(1)(B). Pursuant to § 1132(a)(2), persons entitled to claim relief under § 1109(a) are the Secretary of Labor, and plan participants, fiduciaries, and beneficiaries.

For two reasons, the Defendant contends that the Plan itself lacks standing to sue. It first argues that ERISA does not vest the Plan with the right to sue for a breach of fiduciary duty. It also argues that the Plan has not suffered an injury of its own.

Although both of the Defendant's arguments are sensible, they do not withstand muster under Sixth Circuit precedent. Be that as it may, the Defendant shall ultimately get what it desires in this regard, given the fact that pursuant to said Sixth Circuit precedent, the Plan represents no more than the will of its administrators and trustees, who in this case are the partners of the Plaintiff firm. Given that the partnership is already a Plaintiff, the joinder of the Plan is redundant.

Section 1132(d) provides that an ERISA plan may sue or be sued under subchapter I of the statute, 29 U.S.C. §§ 1001–1191c. At least one circuit has held that this provision does no more than vests ERISA plans with the capacity to sue or be sued; it does not create a cause of action of its own, or in any way amend § 1132(a)(2) to include ERISA plans as separate entities who may bring suit. *See Local 159, 342, 343 & 444 v. Nor–Cal Plumbing, Inc.,* 185 F.3d 978, 983 n. 4 (9th Cir.1999). In other words, the Ninth Circuit has held that while ERISA plans have standing to sue in general, they have such only to the extent there exists a cause of action allowing them to exercise such right. Unless it can be shown that the plan is a participant, fiduciary, or a beneficiary of itself or of some other plan, it cannot sue under § 1132(a)(2). *See id.* at 982–83.

The Court agrees with the Defendant that it was not demonstrated at trial that the Plan at issue herein is a participant, fiduciary, or beneficiary of itself. Howev-

er, the Sixth Circuit approaches the issue from a different perspective. *See Saramar Aluminum Co. v. Pension Plan for Employees of the Aluminum Indus. and Allied Indus. of Youngstown*, 782 F.2d 577 (6th Cir.1986). In *Saramar*, the court held that a plan is a fiduciary insofar as it is nothing less than its administrators, who are themselves fiduciaries. *Id.* at 581. Given that, the Sixth Circuit held that the plan at issue therein had standing to assert a counterclaim under § 1132(a)(3), which entitles a participant, fiduciary, or beneficiary to equitable relief to enforce its rights under ERISA. *Id.*

◼ Under *Saramar*, the Plan has standing to join the Complaint as a Plaintiff. Nevertheless, in this instance, it has done so redundantly, as the partnership itself is also joined as a Plaintiff. Given that the partnership is the Plan administrator, and several of its partners the Plan's trustees, no distinction can be drawn between it and the Plan. Thus, whether designated as the partnership or as the Plan, the Court shall only recognize a single Plaintiff to this suit.[6]

### B. *Defendant's Role with Respect to the Plan*

◼ The gravamen of the Plaintiff's suit is that the Defendant breached its fiduciary duty by failing to educate the Plaintiff with respect to how to calculate the 401(k) compensation of its partners and/or by failing to determine on its own that the Plaintiff had reported erroneous compensation figures. The Plaintiff argues that the Defendant, in so acting or by failing to act,

failed to discharge its duties in a prudent fashion, as required by 29 U.S.C. § 1104(a)(1)(B). In response, the Defendant argues that it was not a fiduciary to begin with.

29 U.S.C. § 1102(a)(1) requires that every ERISA plan be established pursuant to a written instrument and that said instrument provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan. Section 1102(a)(2) defines the "named fiduciary" as the entity named in the instrument as such, or a qualified entity named pursuant to a procedure specified in the instrument.

In addition, § 1002(21)(A) states in pertinent part:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Furthermore, the Department of Labor has published the following, phrased in question and answer format, to help clarify the statutory definition:

---

**6.** The Plaintiffs did not address this issue in their Post Trial Memorandum (Doc. # 39). For purposes of making a complete record, the Court will note herein that to the extent the Plan was named as a separate entity, the Defendant's argument is well-taken. Insofar as the Plan's identity is something other than that of its administrators, it is not a participant, fiduciary, or beneficiary, and therefore does not have standing to sue under § 1132(a)(2). *See Local 159, supra.* Additionally, testimony at trial revealed that the Plan itself suffered no injury in fact; the pecuniary loss was that of the partners and/or the partnership (or the Plan itself if construed, under the *Saramar* analysis, as the collective will of the trustees, who again are the partners).

Q: Are persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan:

(1) Application of rules determining eligibility for participation or benefits;

(2) Calculation of services and compensation credits for benefits;

(3) Preparation of employee communications material;

(4) Maintenance of participants' service and employment records;

(5) Preparation of reports required by government agencies;

(6) Calculation of benefits;

(7) Orientation of new participants and advising participants of their rights and options under the plan;

(8) Collection of contributions and application of contributions as provided in the plan;

(9) Preparation of reports concerning participants' benefits;

(10) Processing of claims; and

(11) Making recommendations to others for decisions with respect to plan administration?

A: No. Only persons who perform one or more of the functions described in section 3(21)(A) [29 U.S.C. § 1002(21)(A) ] of the Act with respect to an employee benefit plan are fiduciaries. Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not

have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75–8, Question and Answer D–2 (2002). *See also id.* at Answer FR–16 ("A fiduciary with respect to the plan who is not a named fiduciary is a fiduciary only to the extent that he or she performs one or more of the functions described in section 3(21)(A) of the Act.").

Where a fiduciary relationship exists, the fiduciary is charged with discharging its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The fiduciary may not contract itself out of its fiduciary duties for exculpatory purposes. *See id.* § 1110(a).

Herein, there is no doubt that the Defendant was not a named fiduciary, as contemplated by § 1102(a)(2). Indeed, the Defendant expressly stated in the Service Agreement that it was not. (PX38 at 6 (TA00011).) Moreover, Article 15.1 of the Prototype Agreement (PX3), as incorporated through the Adoption Agreement (PX39), granted the Plaintiff the right to name a fiduciary other than itself,[7] but no testimony or evidence was given at trial demonstrating, or even suggesting, that it acted under this provision. Likewise, Article 15.5 granted the Plaintiff the right to name an investment manager to direct and manage the investments of the Plan contributions,[8] but it did not. Because the

7. *See* 29 U.S.C. § 1105(c).

8. *See* 29 U.S.C. § 1102(c)(3).

Plaintiff cannot point to the Defendant as a named fiduciary, the question is one of whether the Defendant performed the functions of a fiduciary, as contemplated by § 1002(21)(A) and the Department of Labor guidelines set forth above. This question turns on the Defendant's actual involvement in the operation and administration of the Plan. *See John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank,* 510 U.S. 86, 96, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (observing that "Congress commodiously imposed fiduciary standards on persons whose actiôns affect the amount of benefits retirement plan participants will receive"); *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (stating that ERISA defines "fiduciary" not in terms of formal trusteeship, but in functional terms of control and authority over the plan).

Before addressing this question, the Court must emphasize what is not in dispute. Section 1002(21)(A) contemplates three types of fiduciaries: 1) those concerned with asset management and disposition; 2) those concerned with providing investment advice for a fee; and 3) those concerned with the administration of the plan. The second type is plainly not the concern of the Plaintiff, but, what is more, there is no claim that the Defendant negligently invested Plan funds or otherwise prevented the Plaintiff, in particular the Plan trustees, from exercising its right to manage the investment of Plan contributions. The Plaintiff's entire basis for its breach of fiduciary duty claim stems from its contention that the Defendant was of the third type of fiduciary, concerning Plan administration. If the Court were to delve into the terms of the Contract (PX40), it might well find that the Defendant was a fiduciary insofar as asset management and disposition are concerned. *See* 29 U.S.C. § 1101(b)(2); *Harris Trust, supra.*[9] Such an inquiry would go to an irrelevant issue, however, given that the Plaintiff, as the party bringing the claim, has not alleged any breach related to asset management and disposition. Accordingly, in addressing the question of whether the Defendant was a fiduciary, the Court will confine itself to the context of Plan administration.

For the reasons which follow, the Court concludes that the Defendant was not a fiduciary in this context. Therefore, the claim for breach of fiduciary duties must fail.

The Plaintiff argues in its Post–Trial Memorandum that the Defendant became a fiduciary by giving the Plaintiff "strong and unqualified assurances of its total and complete services and abilities" in response to its request for such assurances. These assurances, in turn, led the Plaintiff

---

9. 29 U.S.C. § 1101(b)(2) provides that where an insurer guarantees benefits pursuant to an ERISA pension plan policy, the plan's assets include the policy (i.e., the guaranteed benefits) but do not, solely by reason of the issuance of the policy, include the insurer's own assets. Thus, "to the extent" an insurer funds a guaranteed policy by investing plan contributions in a general investment account of its own, it does not act as the manager of *plan* assets, and therefore does not act as a fiduciary under § 1002(21)(A); rather, the invested plan contributions become the assets of the insurer (taken in consideration for the guaranteed return benefit), and the risk of investing them is its to bear. In *Harris Trust,* the Supreme Court held that where assets of a guaranteed benefits plan, as invested in a general fund, exceed those designated under the plan's terms to fund the guaranteed benefits, said excess assets belong to the ERISA plan, not the insurer, and the insurer invests them to the risk of the plan and its participants and beneficiaries, not to itself. 510 U.S. at 106, 114 S.Ct. 517. Accordingly, to that extent, it becomes a plan fiduciary. More recently, the Department of Labor has issued regulations to help clarify this subject. *See* 29 C.F.R. § 2550.401c–1 (2001).

to accept the Defendant's services. (Doc. # 39 at 13.) The Plaintiff continues:

> Unrefuted testimony was presented [at the trial] by the staff and partners of the Plaintiff organization of such assurances being given by various representatives of the Defendant. As a result of such assurances, the actual management and the administration of the Plan was fully, and knowingly[,] delegated to the Defendant.

(*Id.*)

The Court respectfully finds that the contrary is true. To begin with, the testimony of the Plaintiff's witnesses did not establish that the Defendant undertook any greater responsibility for the management of the Plan than what was set forth in the Service Agreement. Second of all, even if the Court were to find that the Defendant made certain representations or assurances tending to lead the Plaintiff to believe it was getting something more, the clear language of the Service Agreement itself forecloses a finding that such oral pre-contract terms became part of the actual contract. The Court will elaborate on each of these findings.

*First*, the Plaintiff did not establish that the Defendant gave it assurances beyond that which were ultimately captured in the Service Agreement. James Swaim, a partner with the Plaintiff firm, was the first witness to testify on this issue. Mr. Swaim testified that the partners were generally unfamiliar with how to manage a 401(k) plan, and that it received assurances during the "sales pitch" phase of the relationship that the Defendant would be a "full-service" provider. (Doc. # 43 at 48.) Unfortunately, Mr. Swaim did not address with any particularity what services the Defendant assured it would provide. The most that can be gleaned from his testimony is that the Defendant stated during its

sales pitch that it could provide "everything" and "this service and this expertise." (*Id.* at 48 & 51.) [10] Mr. Swaim himself expressed doubt as to what services such assurances encompassed: "This was a particular project, a particular contractual agreement that we were having with them to provide this, whatever it was. I'm not even still sure what it is." (*Id.* at 50.)

A second partner, Emerson Keck, testified in similar fashion. Mr. Keck testified that the Defendant assured the Plaintiff during its sales pitch that "they were going to take care of really everything for us," and "[l]ead us through this maze." (*Id.* at 89.) He recalled being made to feel really comfortable with and confident in the Defendant's product and services. (*Id.* at 89–90.) Again, however, even if Mr. Keck's state of mind is imputed to the Plaintiff as a whole, these vague descriptions of what services the Plaintiff came to expect from the Defendant do not persuade the Court that the Defendant guaranteed anything more than what was actually included in the contract.

The testimony of a third partner, Charles Slicer, Jr., the principal trustee of the Plan, is similarly light in detail. Mr. Slicer's testimony reveals a prescient appreciation for the problems which ultimately would arise (*id.* at 57), but it does not reveal that the Defendant was the cause of such problems. He testified that the Defendant "said that this plan would work for our partnership and they could put it together and it would work." (*Id.* at 59.) He also testified that when the compensation reporting problems were discovered in 1995 and the Defendant offered to make retro-effective changes for an additional fee, the Plaintiff found this unacceptable, having believed all along that the provision of such services was an obli-

---

**10.** Prior to contracting with the Plaintiff, the Defendant conducted several informational presentations with the Plaintiff's partners and other employees. (Doc. # 43 at 46–50.)

gation of the Defendant by virtue of the Service Agreement. (*Id.* at 65.) Such testimony reveals the subjective belief of the Plaintiff, but it does not demonstrate that the Defendant made any guarantees in the first instance that might lead a reasonable person to look to it as a fiduciary.

What is more, none of the Plaintiff's witnesses identified the individuals who gave the alleged assurances, and the Plaintiff presented no evidence that the representatives making the preliminary sales pitch had any authority to guarantee the provision of any services not subsequently provided for in the Service Agreement. Because the Plaintiff did not demonstrate that the Defendant provided assurances beyond that which were included in the Service Agreement, the Court finds that the Plaintiff failed to demonstrate by a preponderance of the evidence that the Defendant assumed a fiduciary role with respect to the administration of the Plan.

*Second,* even if the Court were persuaded by this testimony that the Defendant made certain oral statements during its sales pitch, to the effect that it could and would provide every service necessary to guarantee the proper reporting of the Plaintiff's self-employed individuals' compensation, the terms of the written Service Agreement preclude a finding that the Defendant assumed a fiduciary role with respect to the administration of the Plan. With respect to the services it agreed to provide, described in the Service Agreement as "routine" services, the evidence adduced at trial, namely the Service Agreement itself, demonstrates that the Defendant agreed to perform ADP testing on the contribution figures, which ultimately depended upon the compensation figures reported by the Plaintiff. (PX38 at 1 (TA00006) § 1.A; *id.* at 8 (TA00013) § 6.B.4.) To the extent the Plaintiff argues

that it was the Defendant's duty to make the correct compensation calculations in the first instance, the argument is belied by the Plaintiff's own evidence. For example, in a series of letters written in early 1993 from Krista Kafka, the Plaintiff's administrative point person, to her contacts at Transamerica, Ms. Kafka informed the Defendant that she would be forwarding the "total compensation" figures for the Plaintiff's self-employed individuals as soon as they were computed by the Plaintiff's accountant, which she eventually did. (PX227; PX250; PX255.) It would hardly be necessary for the Plaintiff to calculate these figures if it believed it was the Defendant's obligation to do so. The more obvious approach would have been simply to provide the Defendant with the raw data that goes into the total compensation calculus. It is apparent to the Court that making the original calculation was not the duty of the Defendant.

As for any duty to verify the Plaintiff's figures, the Plaintiff's expert, Al Minor, pointed out that ADP testing is useless if the underlying figures are inaccurate. (Doc. # 45 at 42.) Be that as it may, nothing in the contract required the Defendant to verify the figures reported by the Plaintiff. For that reason, Minor's testimony that it is basic, common practice for 401(k) plan administrator's, or service providers, to perform such verification tests is irrelevant. (*See id.* at 17–23, 30–31, 43–44.) The agreement at issue herein did not require it. It may have been that the Defendant offered to provide such services in the form of "non-routine" services, but even so, it would have been only at additional cost. (PX38 at 2 (TA00007) § 2.B; *id.* at 9 (TA00014) § 6.C.3.) No evidence was adduced or testimony given suggesting that the Plaintiff ever requested such services or paid an additional cost for such.[11] These services may well be

---

11. To the extent the Plaintiff argues that it did make such a request (*see* Doc. # 39 at 19), the

fundamental in the industry (*see* Doc. # 45 at 44), but that fact does not preclude a service provider such as the Defendant herein from providing such only on a per request basis, and even Minor testified that there is no industry standard regarding the terms of service agreements. (*Id.* at 37.)

■ The Service Agreement is also clear and unambiguous. Although Minor testified that he interpreted the Service Agreement as requiring the Defendant to conduct tests necessary to verify the Plaintiff's reported compensation figures for its self-employed individuals (Doc. # 45 at 41–49 & 52), his testimony in this regard is of no value. Minor was not himself a party to the contract or its negotiations, and his expertise is on 401(k) plan service standards, not contract interpretation. For that reason, it is irrelevant that Minor would expect certain services to be included in a basic coverage package, that he interpreted the Service Agreement at issue to provide as much, and that the Defendant never expressly stated that it would not help the Plaintiff calculate self-employed income. (*See id.* at 48.) To the extent Defendant offered to perform verification tests as a non-routine service, the Service Agreement clearly and unambiguously stated that non-routine services were not provided as part of the standard service package which the Plaintiff purchased, and the Defendant was under no obligation to refuse, affirmatively, to render such services, as they were the Plaintiff's to request.[12] Neither was it demonstrated, by a preponderance of the evidence, that the routine services taken by themselves required the Defendant to verify the compensation reports.

Furthermore, the Defendant expressly disclaimed fiduciary responsibility with regard to the administration of the Plan. (PX38 at 6 (TA00011).) It expressly disclaimed liability for "[a]ny representations made by any agent or purported agent ... other than those expressly set forth in writing and executed ... at its Home Office," particularly with regard to administrative services. (*Id.* at 5 (TA00010) § 5.3.) Finally, the Service Agreement contained a merger clause, under which any and all pre-existing understandings and agreements not set forth therein were disclaimed. (*Id.* at 11 (TA00016).) A reasonable reading of the Service Agreement makes it apparent that the Defendant's contractual duties with respect to the administration of the Plan were limited. These clear and unambiguous provisions preclude the Court from considering antecedent representations to the extent they would alter the terms of the Service Agreement. *See Astor v. International Business Machines Corp.*, 7 F.3d 533, 539–40 (6th Cir.1993); *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir.2001) (stating that if a written contract is completely integrated, "it is

Court disagrees for the reasons stated, *infra*, regarding the negligent misrepresentation claim. Certainly, as the named administrator which declined exercising its prerogative of naming another fiduciary to administer the Plan, the Plaintiff cannot retroactively shift its own fiduciary responsibilities to another. Had it had serious reservations about how to report the compensation of its self-employed individuals, the logical remedy would have been to expressly state as much to the Defendant and expressly request assistance. Its argument that the Defendant *should have re-*

alized that it needed assistance is simply not sufficient to demonstrate that the Defendant acquired even a contractual duty to provide such, let alone a fiduciary duty to do so.

**12.** In its Post–Trial Memorandum, the Plaintiff argues that the terms of the Service Agreement are ambiguous, and that such ambiguities should be construed in its favor, as the non-drafting party. (Doc. # 39 at 17–18.) The Court disagrees, as it does not find the Service Agreement to be ambiguous.

unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made prior to its execution").

■ The Plaintiff references 29 U.S.C. § 1110(a), and cites *Jacobson v. John Hancock Mut. Life Ins. Co.*, 662 F.Supp. 1103 (D.Conn.1987), for the proposition that the Defendant may not exculpate itself by setting forth as a contractual provision a disclaimer of any fiduciary responsibility. With respect to § 1110(a), that provision is only effective if there is a fiduciary responsibility to begin with. Regarding *Jacobson*, one issue confronted therein was similar to that confronted by the Supreme Court several years later in *Harris Trust*, to wit, whether, under 29 U.S.C. § 1101, assets in an insurer's general fund can ever be regarded as belonging to the ERISA plan, such that the insurer can be regarded as their fiduciary. For reasons already stated, that portion of *Jacobson* is irrelevant. *Jacobson* also addressed whether the insurer in that case was a fiduciary by reason of its discretion to manage and administer the plan at issue. The District Court of Connecticut found that it was. 662 F.Supp. at 1112. It also found that the insurer could not simply disclaim its fiduciary responsibility in an instrument. *Id.* at 1111 n. 9. The case is unpersuasive however because the facts are inapposite. That court made numerous findings that supported the ultimate finding that the insurer was a fiduciary as contemplated by 29 U.S.C. § 1002(21)(A). Because of that, its finding that the insurer could not turn around and disclaim such a role was an easy application of § 1110(a). Herein, by contrast, the Court has not found sufficient indicia that the Defendant assumed a fiduciary role with respect to Plan administration. As such, it has no reason to address the application of § 1110(a).[13]

In sum, the Plaintiff, or several of its individual partners, was both the administrator and the trustee of the Plan. No substantial evidence was adduced at trial that it vested any discretion in the Plan's administration in the Defendant under the terms of the Service Agreement. Because the Defendant's duties under the Service Agreement gave it no control, authority, or responsibility with respect to the administration of the Plan, but were purely of the ministerial sort as described by the Department of Labor, 29 C.F.R. § 2509.75–8, the Court finds that it was not a fiduciary as contemplated by 29 U.S.C. § 1002(21)(A).[14] An actual merits analysis of the alleged breach is therefore unnecessary, and on this claim (Count I), judgment shall enter for the Defendant.

**13.** The Court notes that the *Jacobson* decision was withdrawn and vacated in the same reported decision. 662 F.Supp. at 1113. Be that as it may, it would appear that the logic employed by the court in reaching its decision as to the issue of the insurer's administrative fiduciary status remained untarnished.

**14.** Indeed, even if it were determined as a matter of contract that the Defendant assumed the onus of detecting an erroneous compensation report, it is highly questionable whether that additional contractual duty would have given rise to a fiduciary duty. A strong argument exists that the duty to verify a reporting employer's calculations or figures is, like the ADP testing itself, merely a ministerial duty which does not give the insurer, serving in its role as a service provider, any discretion, authority, or responsibility to administer or manage a plan. Indeed, no evidence was adduced or testimony given suggesting that the Defendant itself could have compelled the Plaintiff to adjust its respective contributions had the former discovered that the latter had failed an ADP test in any given year. Certainly not every contractual duty, even when related to an ERISA plan, gives rise to a fiduciary duty.

## C. *ERISA Preemption and Merits Analysis*

The issue the Court will now address is whether the merits of the Plaintiff's Ohio common law causes of action for breach of contract (Count II) and/or negligent misrepresentation (Count III) may be considered by this Court, or whether they are preempted by ERISA.

29 U.S.C. § 1144(a), states:

Except as provided in subsection (b) of this section, the provisions of this subchapter ... shall supercede any and all State laws insofar as they now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title

\* \* \* \* \* \*

This provision has been construed broadly to preempt causes of action brought under state law which would, if not preempted, compromise Congress' intent to make welfare and pension plan regulation the exclusive concern of the federal government. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Firestone Tire & Rubber Co. v. Neusser,* 810 F.2d 550, 552 (6th Cir.1987). State laws, including decisional laws of the state courts, *see* 29 U.S.C. § 1144(c)(1), "relate to" an ERISA plan if they have a "connection with or reference to" said plan. *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir.2000); *Neusser, supra.* On the other hand, where the claim arising under state law bears only a peripheral, incidental, or tenuous relationship to an ERISA plan, it should not be found to be preempted. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Peters v. The Lincoln Elec. Co.,* 285 F.3d 456, 468 (6th Cir.2002); *Cromwell·v. Equicor–Equitable HCA Corp.,* 944 F.2d 1272, 1275 (6th Cir.1991).

The Sixth Circuit has articulated a three-part test for determining whether a state law claim is one which "relates to" an ERISA plan, such that it is preempted, or is, rather, one which is so "remote and peripheral" in its connection to an ERISA plan that it is not preempted. *See Neusser,* 810 F.2d at 555–56. *First,* the Court must determine whether the state law represents a traditional exercise of state authority. *See id.* at 555. *Second,* it must determine whether the law affects relations between principal ERISA entities. *See id.* at 556. *Third,* it must determine the effect that the law, if it is upheld and the claim thereunder found viable, will have on the Plan. *See id.* State laws which have incidental impacts on ERISA plans and their trustees or participants are not preempted by § 1144(a). *See, e.g., id.* at 556 (holding that a municipal tax on ERISA plan tax-deferred contributions is not preempted); *Perry v. P\*I\*E Nationwide, Inc.,* 872 F.2d 157, 161–62 (6th Cir. 1989) (finding that claims of inducement premised on fraud and misrepresentation were not preempted because their relation to the ERISA plan at issue was too tenuous); *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 831, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (noting that tort and collection claims against ERISA plans themselves are not preempted despite their obvious effects on ERISA plans and their trustees); *id.* at 841, 108 S.Ct. 2182 (holding that a garnishment claim against an ERISA plan, brought to enforce judgments against individual plan participants, is not preempted).

The Plaintiff's breach of contract claim clearly relates to the Plan at issue, as it is premised on the Defendant's alleged failure to detect the erroneous reports of the Plaintiff's self-employed individuals' compensation, a duty which the Plaintiff alleges was that of the Defendant

by virtue of the Service Agreement. (Compl. ¶ 21; Doc. # 39 at 17–22.) Although the common law of contracts is traditionally a subject matter for the state courts, that fact is outweighed at present by the fact that the contract at issue is governed by the rules of ERISA, which is exclusively a federal concern. Employing a different standard could alter the relationship between the parties herein, which are ERISA principals (the Plaintiff as the Plan holder; the Defendant as the Plan provider). The claim is therefore preempted,[15] and on this claim (Count II), judgment shall enter for the Defendant.[16]

The negligent misrepresentation claim presents a closer case. From the face of the Complaint, it appears that this claim is based on representations made prior to contracting, and thus premised on a theory that the Plaintiff was induced to contract by the Defendant's negligently stated sales pitch. (Compl.¶ 23.) While this reading of the claim is buttressed by the Plaintiff's "Background" portion of its Post–Trial Memorandum, the argument becomes somewhat blurred in that portion of the Plaintiff's memorandum which expressly relates to the negligence claim, where the Plaintiff argues that the Plaintiff made misleading communications to the Plaintiff after the contractual relationship had begun. (Doc. # 39 at 16–22.) In particular, the Plaintiff makes mention of communications to Krista Krafka, the Plaintiff's administrative point person, which, it alleges, either affirmatively misled her or misled her in that they failed to include pertinent information, namely the proper definition of compensation for self-employed individuals and an explanation of how such should be calculated. (Doc. # 39 at 18–21; PX227; PX250; PX255; PX386.)[17]

As it appears to be characterized in the Complaint itself, the Court does not believe that the negligent misrepresentation claim is preempted. Insofar as it is prem-

15. The Defendant goes a step farther by arguing that the common law claims are "completely" preempted. The Court disagrees. Complete preemption exists where a plaintiff states a claim under state law which could have been stated under 29 U.S.C. § 1132(a). See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Where such is the case, because the claim "is necessarily federal in character by virtue of the clearly manifested intent of Congress," it is recharacterized as an action brought under federal (ERISA) law. Id. at 64–67, 107 S.Ct. 1542. The complete preemption doctrine is more often than not invoked as a jurisdictional mechanism for purposes of removing an apparent state law cause of action filed in a state court to federal court. If applicable, the doctrine does not terminate a claim, it merely forces the Plaintiff to proceed subject to the rules of ERISA. See, e.g., Nester v. Allegiance Healthcare Corp., 162 F.Supp.2d 901, 905 (S.D.Ohio 2001). Herein, the Plaintiff appears in its capacity as a fiduciary; no Plan beneficiaries or participants are joined. Nowhere in § 1132(a), which constitutes the entire universe of available civil remedies under ERISA, is a fiduciary provided the right to seek damages for breach of contract, at least not where the contractual duty does not rise to the level of a fiduciary duty. Accordingly, the complete preemption doctrine is inapplicable.

16. That a plaintiff may be left without a remedy is irrelevant to the preemption analysis, see Cromwell, 944 F.2d at 1276, but the Court suspects an argument could be made that this sort of facts, if not these facts exactly, might give rise to an action under 29 U.S.C. § 1132(a)(3), which allows a fiduciary to obtain "appropriate equitable relief" to redress violations of the terms of an ERISA plan, without regard to the Defendant's status as a fiduciary. This seems to leave the door open to limited contract claims.

17. Several of the Plaintiff's exhibits cited herein by the Court are early 1993 communications from Ms. Krafka to the Defendant, the Plaintiff's argument being that the subject matter of such should have made the Defendant aware of the assistance the Plaintiff now alleges it required and requested.

ised on pre-contract representations, the claim bears only a peripheral, incidental, and tenuous relationship to the Plan. Because these alleged misrepresentations exist independently and without reference to the Plan, and because a finding of liability would in no way affect the terms of the Plan or the relationship of the parties as it relates to the Plan directly, it cannot be said that a claim arising thereunder in any way compromises the principles of ERISA. *See Perry,* 872 F.2d at 161–62.

■ Nevertheless, on its merits, the Court does not find that the Plaintiff proved by the preponderance of the evidence that the Defendant made any such negligent misrepresentations during the parties' preliminary meetings and negotiations. The Court's rationale on this subject echoes that which led it to conclude that the Defendant never assumed a fiduciary role with respect to the administration of the Plan: 1) the testimony given by the Plaintiff's witnesses at trial was too imprecise to persuade the Court that the Defendant represented it would perform anything more than those services ultimately provided for in the Service Agreement; and 2) the Service Agreement itself, had it been given even a brief read by the Plaintiff, should have led the Plaintiff to understand that the role of the Defendant with respect to the administration of the Plan was limited, and defined exclusively by the terms as incorporated into said agreement. (*See* PX38 at 5 (TA00010) § 5.3; *id.* at 11 (TA00016).)

■ As it is characterized in its Post-Trial Memorandum, the Plaintiff's negligent misrepresentation claim is premised in one respect on the argument that the Defendant gave negligent misrepresentations when it *failed to address,* in various response communications (both telephonic and written), the issue of how to report properly the compensation of self-employed individuals, and in a second respect on the argument that the Defendant made at least one *affirmative* misleading statement. The Court again believes that the factors set forth in *Neusser* favor a finding that the Plaintiff's negligent misrepresentation claim, understood in this context, is not preempted.[18] Tort and negligence law is certainly an area of traditional state concern. In addition, although the claim will have an effect on the relationship between the parties, the effect is not on the contractual (i.e., ERISA) relationship. It is merely a tort action, resulting from communications that had nothing to do with the terms of the Plan. Finally, the Plan itself would escape completely unscathed were the Court to find the claim meritorious. With regard to the latter two factors, the Court will elaborate.

Assuming for the moment that the Plaintiff's negligent misrepresentation claim has merit, its connection to the parties' ERISA relationship is purely incidental. The entire dispute centers around the legal definition of compensation for self-employed individuals, an issue of federal tax law. By analogy, had Polly Wong, the Defendant's employee who misrepresented the compensation definition, been an independent tax consultant to the Plaintiff, and had she negligently given erroneous tax advice, her misrepresentation would no doubt have given rise to a viable cause of action sounding in negligence, her liability extending to those damages attributable to the misrepresentation. That is essentially what occurred in this instance. While the Defendant had no duty as a matter of contract or fiduciary status to instruct the Plaintiff on how to calculate the compensa-

---

**18.** The Defendant did not raise any objections to this characterization of the Plaintiff's claim for negligent misrepresentation, and the Court is of the opinion that the claim may be considered on this basis.

tion of its self-employed individuals, once it proceeded to respond to the Plaintiff's queries and offer such advice, the usual common law rules regarding negligence and misrepresentation attached. The fact that the Plaintiff used that information in preparing compensation figures for a plan governed by ERISA does not require a finding of preemption, as neither that act, nor the Defendant's act of providing the information, is related to ERISA law or any of its underlying principles, and neither act bears on the contractual relationship between the two parties.

The fact that the alleged misrepresentations were made after the ERISA relationship between the parties had been consummated is also of no matter. In explaining its holding in *Perry*, the Sixth Circuit clarified that it is not the timing of a misrepresentation that controls, although that factor can be considered, but is, rather, whether giving life to the state law claim would interfere with the remedial scheme created by Congress. *See Lion's Volunteer Blind Indus., Inc. v. Automated Group Admin., Inc.*, 195 F.3d 803, 808 n. 3 (6th Cir.1999). Furthermore, the result in *Cromwell*, in which the Sixth Circuit held that a negligent misrepresentation claim was preempted, is inapposite. *See* 944 F.2d at 1275–76. After the administrator in that case determined that the apparent beneficiary was, in fact, not entitled to benefits, it stopped remitting payments to the apparent beneficiary's healthcare provider, as it had been doing pursuant to a three-way assignment of benefits agreement. The healthcare provider then filed suit against the administrator to collect for its uncompensated services, alleging that it would not have provided benefits to the apparent beneficiary had it not been for the negligent misrepresentation from the administrator that the apparent beneficiary was indeed entitled to benefits. The Sixth Circuit found that the healthcare provider was seeking nothing more than

benefits under the ERISA plan, a claim which went to "the very heart of issues within the scope of ERISA's exclusive regulation." *Id.* at 1276. Because Congress created such a right for plan participants and beneficiaries, *see* 29 U.S.C. § 1132(a)(1)(B), but not third-party beneficiaries, the Sixth Circuit readily held that the action was preempted. 944 F.2d at 1276. Holding otherwise "would affect the relationship between plan principals by extending coverage beyond the terms of the plan." *Id.*

*Cromwell* is consistent with decisions of other courts which have held that misrepresentation claims cannot be utilized as an alternative means of collecting benefits under ERISA plans. *See Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 378 (4th Cir.2001) (holding as much and collecting cases holding the same). However, the claim as stated herein is not similar to that at issue in *Cromwell* and its kin. Here, none of the Plan and its terms, the Plan benefits, the rights of Plan participants and beneficiaries, and the relationship between Plan principals, at least insofar as it concerns the Plan directly, are at issue, and none will be impacted by a judgment favorable to the Plaintiff.

For example, where a plaintiff sued physicians for negligent misrepresentation, premised on the fact that the physicians failed to disclose their financial incentive under an ERISA plan to minimize referrals to specialists, the Eighth Circuit held that the claim was not preempted. *Shea v. Esenten*, 208 F.3d 712, 717–18 (8th Cir. 2000). "The express reference to the ERISA plan that will arise in this tort suit is necessary to demonstrate the origin of the physician's potential conflict of interest under state law, but the plan itself is peripheral to the ultimate issue of whether the physicians violated the state ethical duty to disclose a financial conflict of inter-

est." *Id.* at 718. The reference to the Plan herein, necessary only to demonstrate how the alleged misrepresentation caused economic injury, is equally peripheral. The claim turns not on an asserted right to benefits, but on whether the Defendant misrepresented a fact which it had reason to know would be relied upon by the Plaintiff in conducting its business affairs.

Accordingly, the Court finds that the Plaintiff's negligent misrepresentation claim, insofar as it arises out of alleged misrepresentations communicated in response to its own alleged requests for assistance, is not preempted.

Turning to the merits of such claim, the Plaintiff argues repeatedly that it made it clear to the Defendant that it needed assistance in calculating the compensation figures. In responding to its inquiries, it continues, the Defendant failed to address the issue in adequate fashion. In addition, on at least one occasion, the Defendant affirmatively misled the Plaintiff into thinking that it was calculating the compensation figures pursuant to the correct formula. The Court will first review the elements of a negligent misrepresentation cause of action, and then consider the above arguments.

 A claim for negligent misrepresentation is established by proof showing that "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Delman v. City of Cleveland Heights,* 41 Ohio St.3d 1, 534 N.E.2d 835, 838 (1989) (citing Restatement (Second) of Torts § 552(1) (1965)). Importantly, it has been noted that a claim for

negligent misrepresentation does not apply to omissions. There must be an affirmative false statement. *See Leal v. Holtvogt,* 123 Ohio App.3d 51, 702 N.E.2d 1246, 1261 (1998); *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App.3d 137, 684 N.E.2d 1261, 1269 (1996).

An adequate definition of self-employed individual compensation was included in Article 1.5 of the Prototype Agreement (PX3), as incorporated into the Plan through the execution of the Adoption Agreement (PX39). While, as a practical matter, the definition may appear buried in the myriad Plan documents, and seem, if ever discovered, not just a little abstruse, these facts alone, as the Court has already observed, did not impose upon the Defendant a duty to provide any greater assistance, or even to direct the Plaintiff by affirmative action to that definition. To the extent the Plaintiff argues that it requested such assistance from the Defendant in writing and that the Defendant failed to address any such request in its responses (Doc. 39 at 19; Doc. # 40 at 3, proposed finding 9), the claim must fail because only affirmative representations can form the basis of a negligent misrepresentation claim. *See Leal, supra; Nationwide, supra.* Additionally, the evidence on which the Plaintiff relies to establish that it made written requests for assistance, namely three letters written in early 1993 from Ms. Krafka to Ms. Wong, makes no mention of any request for assistance, and cannot in any reasonable fashion be read to imply such a request. (PX227; PX250; PX255.)

On the other hand, there was unrefuted testimony from Ms. Krafka that in 1993 she verbally requested help from Ms. Wong and another contact, Coletta Fenner, in revising the 1992 compensation figures. (Doc. # 43 at 111–113.) According to Ms. Krafka, she was told by Ms. Wong

that in calculating the compensation for the Plaintiff's self-employed individuals, she should report their gross compensation less the deductions which they had made to the Plan. (*Id.* at 112.) This testimony was not refuted by the Defendant at trial or addressed by it in its Post–Trial Brief (Doc. # 37). The extent of the Defendant's response to this claim in its Post–Trial Brief is that it was under no contractual obligation to supply the Plaintiff with any greater information than that covered by the Service Agreement, and the Service Agreement itself contained no misrepresentations. (Doc. # 37 at 8–9.) The Court does not disagree, but that argument is one against breach of contract, not against negligent misrepresentation. It is therefore irrelevant.

Ms. Wong should have appreciated in her business dealings with Ms. Krafka that the information she provided would have serious ramifications if it were incorrect. The Court found Ms. Krafka's testimony both credible and truthful, and the Defendant gave the Court no reason to find it otherwise. Moreover, assuming that the definition of "compensation" provided at Article 1.5 of the Prototype Agreement is correct (*see* PX3 at 1 (TA02639)), the information provided Ms. Krafka by Ms. Wong was incorrect in that it did not take into account all necessary factors. While it is true that the Plaintiff was bound by the Prototype Agreement, in the real world, away from legal arguments which may be technically correct on paper, people rely on other people in making decisions, and a business should not be able to lead its clients to believe that one way of doing a particular thing is correct, and later turn around and point to the contract when it is discovered that its extra-contractual advice was wrong.

With that in mind, the Court finds that the Plaintiff proved, by a preponderance of the evidence, that the Defendant, in the course of its business dealings with the Plaintiff, unreasonably supplied false information for the Plaintiff's guidance in its own business transactions, upon which the Plaintiff relied justifiably, and because of which the Plaintiff suffered a pecuniary loss.

Unfortunately for the Plaintiff, that is not the end of the analysis. As the Court has already pointed out, under the terms of the Service Agreement, the Plaintiff agreed to hold the Defendant harmless for "[a]ny representations made by any agent ... of the Company other than those expressly set forth in writing and executed by the Company at its Home Office." (PX38 at 5 (TA00010) § 5.3.) While clauses which relieve a party of liability for negligence are not favored by the law, such clauses are enforceable unless contrary to a specific public policy. *See Glaspell v. Ohio Edison Co.,* 29 Ohio St.3d 44, 505 N.E.2d 264, 266 (1987). Such clauses should be narrowly construed against the drafter, which in this case is undoubtedly the Defendant, but where such a clause is clear and unambiguous, it will not be discounted absent evidence that the Plaintiff was not able to negotiate freely the terms of the Service Agreement. *See id.* Exculpatory clauses do not have to expressly state that a party will not be liable for its "negligence." *See Swartzentruber v. Wee–K Corp.,* 117 Ohio App.3d 420, 690 N.E.2d 941, 945 (1997). The key is whether it is clear from the terms of the Service Agreement, "considered in light of what an ordinary prudent and knowledgeable party of the same class would understand," that the Defendant is to be relieved from liability. *Id.* "[A]bsent 'unconscionability' or vague and ambiguous language, such limiting or exculpatory provisions will be upheld. Generally, a contract evading liability for negligence will be enforced (1) when the contracting

parties stand in roughly equal bargaining positions, or (2) even if great disparity exists in the relative positions of the contracting parties, when nonexculpatory contract options are provided for a greater consideration, instead of accepting the risk of the superior party's negligence." *Orlett v. Suburban Propane,* 54 Ohio App.3d 127, 561 N.E.2d 1066, 1068–69 (1989).

The Court must conclude that the exculpatory clause in the Service Agreement is valid and enforceable. Although the Court may assume, without deciding, that the Defendant in this case, a large insurance company with a national market, had the stronger bargaining position, the Plaintiff chose to contract with the Defendant only after having considered several alternative plan providers, and because the majority of its members felt comfortable with its experience in the industry. (Doc. # 43 at 46–49.) In addition, the Plaintiff had the opportunity to choose an administrator other than itself and/or to select additional services provided by the Defendant which likely would have prevented the difficulties it ultimately encountered, options it did not exercise. Moreover, it is an established and well-regarded law firm. While it is clear that none of its members practice ERISA law, the exculpatory clause, which is clearly and unambiguously set forth in the Service Agreement, bears no relation to ERISA itself and must have been, or at least should have been, understood. If it were an unacceptable term, the Plaintiff should have requested that it be modified or stricken.

In sum, although the Court finds that the Defendant negligently misrepresented a material fact to the Plaintiff, under the terms of the Service Agreement it cannot be held liable.

As to the claim for negligent misrepresentation (Count III), in all respects, judgment shall enter for the Defendant.

To recapitulate, the Court concludes that the Plaintiff's claim for breach of fiduciary duties (Count I) must fail because it has not shown by a preponderance of the evidence that the Defendant was a fiduciary. The claim for breach of contract (Count II) must fail because it is preempted by ERISA. The claim for negligent misrepresentation (Count III) must fail as to alleged pre-contract misrepresentations, because the Plaintiff has not shown by a preponderance of the evidence that such misrepresentations were made; as to alleged post-execution misrepresentations in the form of misleading omissions, because Ohio does not recognize such a claim; and as to one, actual post-execution affirmative misrepresentation, because, under the terms of the Service Agreement, the Defendant cannot be held liable for any representation made by any agent, where such is not set forth in writing and executed at its Home Office. Given that the Plaintiff's have failed to show by a preponderance of the evidence that the Defendant can be held liable under either federal or state law, its claim for damages and attorney fees (Count IV) must be denied.

## IV. Conclusions of Law

1. To the extent the Plan is suing as its own entity, distinct from its character as the will of its administrators and/or trustees, it is neither an ERISA plan beneficiary, participant, nor fiduciary, and therefore cannot sue under 29 U.S.C. § 1132(a).

2. To the extent the Plan is suing as the will of its administrators and/or trustees, who are themselves fiduciaries, it has standing to sue. However, because the Plan administrators and trustees, who are each the Plaintiff or several of its partners, are already themselves a Plaintiff, the Court recognizes but a single Plaintiff in this action.

3. The Plaintiff failed to prove by a preponderance of the evidence that the Defendant was a named fiduciary.

4. The Plaintiff failed to prove by a preponderance of the evidence that the Defendant was a fiduciary with respect to the administration of the Plan.

5. The Plaintiff's claim for breach of contract is preempted by ERISA.

6. The Plaintiff's claim for negligent misrepresentation is not preempted by ERISA.

7. To the extent the Plaintiff's claim for negligent misrepresentation concerns alleged misrepresentations made by the Defendant prior to the execution of the Service Agreement, the Plaintiff failed to prove by a preponderance of the evidence that any pre-contract representations were incorporated into the Service Agreement.

8. To the extent the Plaintiff's claim for negligent misrepresentation concerns alleged misrepresentations made by the Defendant after the execution of the Service Agreement, specifically that the Defendant did not direct the Plaintiff to the correct definition of compensation for self-employed individuals, or did not instruct the Plaintiff on how to calculate as much, no relief can be granted under the law of Ohio, and, in any event, the evidence does not support the claim.

9. To the extent the Plaintiff's claim for negligent misrepresentation is premised on the fact that the Defendant affirmatively and unreasonably misrepresented the correct method of calculating compensation for self-employed individuals, under the terms of the Service Agreement the Defendant is relieved of any liability.

10. In the absence of any Defendant liability, the Plaintiffs are not entitled to damages or attorney fees, or any other remedy sought in the Complaint.

Based on the foregoing, the Court hereby directs judgment to be entered in favor of the Defendant on all Counts as plead in the Complaint (Doc. # 1).

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.